WILLIAM H. CARUTHERS and WIFE, plaintiffs in error, *vs.* HENRY L. CORBIN, executor, *et al.,* defendants in error·

| 38 | 75 |
| 114 | 557 |

1. By the laws of South Carolina, as they existed in 1835, a will practically emancipating slaves was invalid, so far as such object was concerned; but other bequests, in the same will, were not affected thereby.
2. Our laws will not enforce the provisions of a will, made in another State, which are directly contrary to the declared policy of this State; but the judgment of a competent tribunal, as to such will, where the will was executed, will be respected by the Courts of this State.
3. Debts due by a deceased executor, administrator, guardian or trustee, entitled to priority of payment, in the administration of assets, as provided by the Code, sec. 2312, and par. 4 of sec. 2494, are such only as may be due by persons appointed by the laws of this State. Trustees appointed in other States are not embraced. Debts due by foreign executors, trustees, etc., are to be paid, according to their character, as bonds or accounts, etc., the same as if owing by others, without any priority on account of such character. HARRIS, JUDGE, dissenting.
4. If a creditor receive, in payment of his debt, a depreciated currency at its nominal value, without fraud or mistake, he will be bound by such payment.
5. If an administrator or executor pay debts of an estate with less than is due upon them, he shall not take the benefit of it himself; but other creditors and legatees shall have the advantage of it. The estate is entitled to all the benefits arising from such payment, and not the executor personally.

The full statement of these cases, in the opinion of Judge Walker, renders a report of them unnecessary. It was held up for a time.

Brief of points made, and authorities submitted by Cobb & Jackson and Samuel Hall, counsel for John J. Corbin and Alexander G. Lane and wife:

I. Mrs. Parr having died in the lifetime of Mrs. Corbin, leaving no issue living at her death, there are, by the express terms of the 6th item of John J. Saylor's will, cross-limitations between the issue of the said Mrs. Parr and Mrs. Corbin, and the children of Mrs. Corbin are entitled to the property that went into Mrs. Parr's hands from the estate of John J. Saylor. The estate was to be kept together and managed until the death of the last of testator's brothers and sisters, when one-sixth or one-twelfth part of it was to be conveyed to the children of his brother, by the trustees: and then it provides, " that they (the trustees) will convey the said residue of my estate, say five-sixths or eleven-twelfths, (as the case may be,) unto the children of my said two sisters, say to such children or CHILD of my said two sisters AS MAY BE ALIVE AT THE DEATH OF THE SURVIVOR" OF THEM, the said *Mary, Marcella Caroline* and Samuel S. I mean that one moiety, or half of the five-sixths or eleven-twelfths of said balance or residue, shall be conveyed to the child or children of my sister, Mary Parr, THEN alive, share and share alike; and the other moiety, or half of said five-sixths or eleven-twelfths of said residue or balance of my estate, to the children or child of my sister, Marcella Caroline Corbin, share and share alike."

In order to arrive at the intention of a testator, and give effect to the same, as far as is consistent with the rules of law, the Court, in the construction of wills, may transpose sentences or clauses, change connecting conjunction, or even supply omitted words. Code, sec. 2424. These sentences, transposed, would read thus : " One moiety of the five-sixths or eleven-twelfths of the residue of my estate shall be conveyed to the child or children of my sister, Mary Parr, alive at the death of the survivor of my said sisters and

brother, and the other moiety thereof to the child or children of my sister, Marcella Caroline, THEN alive. The whole residue, say five-sixths or eleven-twelfths, (as the case may be,) of my estate, to be conveyed unto the children of my said two sisters, say to such children or CHILD of my said TWO sisters, as may be alive at the death of the survivor of them, the said Mary, Marcella Caroline, and Samuel S."

The offspring of these two sisters alive at the death of the survivor of the testator's brother and sisters, were the preferable objects of his bounty, and it matters not whether they were the offspring of one sister or both. If only one had offspring living, that offspring was to take the whole five-sixths or eleven-twelfths; if offspring of both was *then* alive, this residue was to be divided among them per *stirpes* and not per *capita,* share and share alike. And this the testator has said in terms, or thought he had said in terms, else, why, when providing for the failure of his brother's issue upon the happening of the contingency on which the the *corpus* of the property was to be conveyed, does he make this provision? "But if my brother die leaving no child alive, or if he leaves a child, and that child shall die leaving no issue, my will is, that the provision above made for my brother's child or children shall revert and become a part of my residuary estate, and be disposed of to my sisters and their children, as is above provided," etc.

II. If cross-limitations do not exist, by express words, between the children of Mrs. Parr and Mrs. Corbin, then to effectuate the intention of the testator, they are to be raised by "necessary implication," "plain intention," or "evident demonstration."

For the general doctrine of estates by implication and cross-remainders, the Court is referred to 2 Blackstone's Com., 381, 382; Ken's Ed., 388, 389.

As to meaning of "necessary implication" and equivalent terms, see per Lord Eldon, 1 Roper on Leg., 84. Ib., 724; per Lord Mansfield, 1 Fearne on Rem. Appendix iii, 589, Jones vs. Morgan; per Lumpkin, C. J., 12 *Ga. R.,* 155, *Wright vs. Hicks.*

Cross-remainders among tenants in tail take place "by necessary implication" under the following circumstances:

1st. Under a devise to several persons in tail, being tenants in common, with a limitation over for want, or in default of such issue, cross-remainders are to be implied among the devisees.

2d. This rule applies whether the devise be to two persons or a larger number, though it be made to them respectively, etc.

3rd. The rule applies with regard to executory trusts, at least, though there be an express direction to insert cross-remainders among another class of objects, or a limitation over among some of the same objects, and even in direct devises, an express limitation of cross-remainders among *another* class of objects, has been held not to repel the implication.

4th. The word *remainder* following a devise to several in tail will raise cross-remainders among them. 2 Jarman on Wills, 379.

5th. But the occurrence of this, or some tantamount expression, is not indespensable to the result. The intention of the testator may be implied from other circumstances. Hobart, 34, citing Year Book 7, E. 6; 6 Bacon Ab. Tit. Legacies and Devises, (J.), p. 107.

6th. When an intention appears from the will that no other person shall inherit any portion of the estate, or take it by way of remainder, so long as any of the immediate devisees or any of their issue are living, cross-remainders will be implied. Bacon Ab. *ut.* Sap., p. 108; 3 Greenleaf's Cruise, 412, Note 2; 4 Day, 368–372, Hungerford vs. Anderson; Dyer 303, b. pl. 49; 2 Bailey, 442, Baldrick vs. White; 4 S. & R., 368, Simpson vs. Coon; 2 Hal., 41, Den vs. Cook; 2 Bing., N. C., 422, Brook vs. Turner; 5 Metc., 134, Parker vs. Parker.

7th. Cross-limitations take place among legatees or devisees in fee where even the title is to vest upon a contingency, and the contingency does not happen in time for the title to vest, and the intention of the testator would be defeated if the

implication was not made.   2 Pierre Will, 68, Scott vs. Bargeman; 2 Jarman on Wills, 481, 483; Ves., 236, 536, Mackell vs. Winter; 3 Mer., 334, Skey vs. Barnes; 4 Beav., 117, Currie vs. Gould; 2 Jarman on Wills, 487; 2 Roper Leg., 1439, *et seq.*

8th.  The property did not vest in this case until the death of the last survivor of the sisters and brothers of the testator, and so literal a fulfillment of the conditions upon which it was to vest, is not required, as would be to divest it where it has once vested.   Shepperd's Touchstone, 133.

9th.  The vesting of the property depended upon a contingency which rendered it uncertain who would be the legatees, and this makes the legacy contingent.   2 Bla. Com., 169; 1 Fearne Rem., 3, 381; Lewis on Perp., 72, 56.   The trust is executory as well as contingent, and for that reason must receive an indulgent construction.   2 Blackstone's Com., 381, 382, Jones vs. Morgan; 1 Fearne Rem. App. iii, Edmonson and Wife vs. Dyson; 2 *Kelly*, 307, 312, 313, 314; Fearne Rem., 185, Earl of Stamford vs. Sir John Hobart cited and commented on; Fearne on Rem., 117–120, 338.

III.  S. P. Corbin held this property in trust, and was a naked trustee, and responsible as such.   Lewin on Trusts, 243, Byrchall and Wife vs. Bradford *et al.*; 6 Madd. Ch. R., 241, Dix vs. Benford; 19 Beav., 401, cited by Lewin, 243; Hill on Trustees, 214, 215; Lewin, 242, citing Conyngham vs. Conyngham; 1 Ves., 522, and Montgomery vs. Johnson, 11 Iredell's Eq., 476.

IV.  But whether he held, as administrator or trustee, the debt of the *cestui que trusts* is a preferred one.   Code, sec., 2496 par. 4.

V.  The defendants, John J. Corbin and Lane's wife, not being *in esse* at the rendition of the decree by the Court of Chancery in Lexington District, South Carolina, in favor of Corbin and Wife vs. Mrs. Parr and the other legatees under John J. Saylor's will, are not bound thereby.   Huson vs. Wallace; 1 Richardson's Eq., 1; 1 Daniell's Ch. Pr., 90, 95, 207.   And if they were, that decree interferes with none of the rights or trusts under that will.

VI. The change of property, ordered by that decree, left untouched the rights of the legatees under the will. Lewin on Trusts, 274. The cestui que trust could follow the property into which it is converted, and impose the trust upon all profits derived from the conversion, and that whether mixed with the property of the trustee or kept separate. Dockers vs. Somers, 2 M. & K., 655, (1 W. & T. Lea Cas., 347 ;) Fellows vs. Mitchell, 1 P. Williams, 83, Lewin, 337 ; Lupton vs. White, 15 Ves., 420 ; Code, secs, 2310, 2315, Lewin, 753 ; Taylor vs. Plumer, 3 M. & S., 562 ; Pennell vs. Deffell, 23 Eng., L. and Eq. R., 460 ; Conard vs. Atlantic Ins. & Trust Co., 1 Peters, 386 ; Nathan vs. Giles, 5 Taunt (1 E. C. L. R.)

VII. The children of S. P. Corbin have to be advanced in proportion to the amounts received by Caruthers and wife from his executor; Dyose; vs. Dyose, 1 P. Williams, 305 ; Humphreys vs. Humphreys, 2 Cox C. C., 184, 185, 186.

VIII. S. P. Corbin being trustee, was liable for all that came into his hands from Saylor's estate, whether he received it as trustee or in any other capacity. Lewin on Trusts, 326 –330.

IX. Under the laws of South Carolina, as they existed when Saylor's will took effect, the clauses thereof, in relation to the manumission of the slaves, were valid. Lenoir vs. Sylvester, 1 Bailey, 632 ; Gordon vs. Blackman, 1 Rich. Eq., 65, S. C.; 2 Ib. 43 ; Frazier vs. Frazier, 2 Hill's Ch. R., 304.

X. But whether these clauses are valid or not, no benefit can inure to testator's heirs at law, for there is a valid disposition over to strangers. 1 Richardson's Eq. R., 63, Gordon vs. Blackman, S. C.; 2 Richardson's Eq. R., 45 ; 2 MCord C. R., 269, Hall vs. Hall ; 2 McMullen, 454, Carmille vs. Wightman ; 15 Ves., 417, Dawson vs. Clarke ; 2 Ves., Jr., 284, Note 6 ; Pickering vs. Lord Stamford ; 8 Ib., 12 Cambridge vs. Rous ; 12 Ga. R., 163, Wright vs. Hicks.

XI. Corbin purchased the negroes at the sale of Saylor's estate, with the trust funds, but made such purchase on his own responsibility—took the titles in himself—used

Caruthers and Wife *vs.* Corbin, ex'r, *et al.*

said negroes, and disposed of them as his own property, which was a conversion; and he thereby became responsible to the *cestui que trusts* for the amount of trust funds, with interest on the same from the death of Mrs. Corbin, and not simply for the hire of the negroes, as reported by the Master in Chancery, and affirmed by the Court below.

XII. We are entitled to recover interest on the portion received from Mrs. Parr, from her death, in 1848, and not from the death of Mrs. Corbin, as reported by the Master.

They subsequently submitted another brief, as follows:

The question upon which a portion of the Court, as we are informed, hesitates in this case, and which we do not remember to have been suggested on the argument, and which was therefore not discussed, is this: The trusts being created in the State of South Carolina, and the trustee having removed to, and settled in, Georgia, (bringing with him the trust property) where he died indebted to the trust estate, and his effects being administered here, (the *cestui que trust* being prior to, and at the death of the trustee, also citizens of Georgia,) do they take under the law of this State regulating the order of the payment of deceased persons' debts, as preferred, or merely as simple contract, creditors?

We think the following propositions are clearly deducible from the authorities:

1st. That the law appointing the order in which distribution shall be made, is local in its operation and has no extra territorial force; and, therefore, if the laws of South Carolina had secured priority in this respect to the *cestui que trust*, that provision would not have been observed if the administration was taken out in Georgia and the distribution made here.

2d. It follows that the law of the place where the administration is taken is to be observed in the order of distribution prescribed by that law.

3d. This is the result of two well settled principles: 1st. That the laws of distribution of the place where the contract was made, and where it was contemplated it should be executed, is no part of the contract, but is a part of the remedy.

These laws belong to the proceedings in suit, (*ad litis ordinationem,*) not to the merits of the claim (*ad litis decisionem.*) And 2d. Because comity does not require the observance of the laws of a foreign jurisdiction, where such laws interfere with the settled policy of the country, of the tribunal appealed to, for the enforcement of the demand or collection of debts.

4th. Because the foreign creditor is entitled to all the benefits of the remedy to which any other creditor is entitled, unless he shall be expressly or impliedly excluded therefrom by the law affording the remedy.

5th. These general principles are applicable to liens, hypothecations and priorities given to creditors by the laws of particular countries as well as to other claims.

As to the first, second and third propositions, Harrison *vs.* Story, 5 Cranch, 299. Smith, adm'r *vs.* Union Bank of Georgetown, 5 Peter's R., 518. McElmoyle *vs.* Cohen, adm'r, 13 Peters, 328. Ten Eyck *vs.* Ten Eyck, ———. Milne *vs.* Morton, C. Burney, 36. Potter *vs.* Brown, 5th East's R., 131. Story on C. of L., secs. 524, 525, 575 *et seq.*, and 322 to 339, (edition of 1846,) and the Code of Georgia, sec. 2943, pr. 4.

B. HILL and WALLACE for Caruthers and Wife.

WALKER, J.

In 1834, John J. Saylor, then of Lexington District, South Carolina, made his will, and died, in South Carolina, pretty soon thereafter, say in 1835. By this will he provided for the practical emancipation of six certain favorite slaves, and made sundry bequests in their favor. The bulk of his property was left to his brother and sisters, during life, and at their death to their children. The leading object of the will was to secure the practical or actual emancipation of the favorite slaves, if possible; and the other bequests were made conditional upon all the beneficiaries under the will, aiding to effectuate this object. After making certain specific bequests which disposed of but a comparatively small

portion of the estate, he devises, in the sixth item, to trustees, the residue of his estate, both real and personal, to be held in trust for the benefit of testator's sisters, Mary Parr and Marcella Caroline Corbin, (wife of Samuel Peter Corbin,) and his brother, Samuel S. Saylor, in the following proportions: say one sixth of the annual income arising from such residue for the benefit of said brother during his life; and the remaining five-sixths of such income for the use of said two sisters during their natural lives. After the death of the brother and sisters, said trustees were to convey one-sixth of said residuum to the children of the brother, should he die leaving more·than one, share and share alike; but if he should leave but one child, him surviving, then but one-twelfth of said residue should be conveyed to such child; the trustees were to convey the balance of said residue, say five-sixths or eleven-twelfths, (as the case may be,) to the children of said two sisters, (say to such children or child of said two sisters as may be alive at the death of the survivor of the sisters.)  "I mean that one moiety, or half·of the said five-sixths or eleven-twelfths of the said residue, or balance of my said estate, shall be conveyed unto the child or children of my said sister, Mary Parr, then alive, share and share alike; and the other moiety or half of said five-sixths or eleven-twelfths of the said residue, or balance of my estate, unto the child or children of my sister, Marcella Caroline Corbin, share and share alike." The increase of the estate was intended to be included, subject to the limitations, conditions, and restrictions specified in relation to the six favorite negroes, "which conveyances shall become null and void, if the intentions of my will, in relation to my said servants, shall be opposed or neglected by the persons thus taking said property." The will further provided, that if either the brother or sisters should die, leaving a child or children, such child should take the share which the parent would have taken if alive; and, in order to dispose of the income, until the death of the last surviving sister or brother, it was provided, that if the brother should die first, one-sixth of the net annual income, until the death of the last survi-

ving sister, should be paid to his children, if more than one; if only one, then one-twelfth; but if one of the sisters should die, her children should take their mother's share, until the death of the last survivor of the three; if the brother should die leaving no child, the provision made for his child or children was to revert, and become a part of the residuary estate, to be disposed of as provided for the sisters and their children. The property was not to be subject to the debts of the brother or sisters, or the husbands of the sisters. If any beneficiary should oppose the intention of the testator relative to said six favorite slaves, the portion which would come, under said will, to such person opposing said intention, was devised to the Theological Seminary of the Lutheran Church of South Carolina, provided said corporation would carry out his desires; and if said church would not do so, then such portion was devised over to the Commissioners of the Free Schools for Lexington District, who were to become trustees to carry out testator's intentions in regard to said six negroes. The will imposed certain duties on the trustees in relation to the care and management of certain portions of the property, for the use of said six negroes, which must necessarily have continued for a long series of years, and was such "a troublesome office" that the trustees declined to act.

Samuel D. Corbin, the husband of Mrs. Marcella C. Corbin, was appointed by the proper court to carry out the provisions of the will, and meeting with difficulties, filed a bill in the Courts of South Carolina, for the distribution of the estate among the legatees, according to their respective shares under the will. Chancellor Johnson, before whom the case was heard, refused to grant the prayer of the bill, on the ground that to do so "would be making a will for the testator, a power which this Court disdains," and he dismissed the bill. This ruling was excepted to, and the Supreme Court of South Carolina reversed the decision of the Chancellor, and thereupon a division of the property was had, under the direction of the Court of Chancery. This division took place about January, 1840. In the division, the children of Samuel Saylor received one-sixth of the residuum of

the estate, (the specific devises in favor of said six negroes being strictly carried out,) and the other five-sixths being equally divided between Mrs. Parr and Mrs. Corbin. The whole transaction seems to have been treated by the Court and the parties as a final distribution and settlement of the affairs of the estate of John J. Saylor. The negroes were provided for, according to the terms of his will; and the residue of his property was divided between his sisters and the children of his brother, in the proportion he had intended. The division, however, took place during the lives of the sisters, and not after their deaths, as the testator intended that it should be. His brother was dead. The negroes were sold for distribution, and Samuel P. Corbin purchased just about as many of them as were coming to his wife and children, and brought them to Georgia, and kept them until his death, and they remained in the hands of his executor until they were emancipated. Samuel P. Corbin died in Taylor county, Georgia, about the latter part of November, 1862, having executed a will, appointing his brother, Henry L. Corbin, as his executor, who qualified as such, and filed a bill for direction, in Crawford Superior Court, alleging the emancipation of the slaves, and the insolvency of the estate in consequence thereof; and praying that the various creditors might be required to prove their demands, that the Court might adjudicate and settle the amount and order of payment of the various claims against the estate, etc. An injunction was granted to restrain the creditors from proceeding at law. During the progress of the case, the whole matter was referred to W. K. deGraffenried, Esq., Master in Chancery, who was directed to report "the state of the account between said Henry L. Corbin and the estate, and between him and said contestants and claimants and creditors," and report his decisions upon all questions of law and fact arising between the parties. Said Master in Chancery proceeded to take the account, and made his report to the Court, and the Court, after hearing the exceptions, confirmed the report; and to the judgment affirming the report, various exceptions were made and brought to this Court.

We do not propose to notice all the questions made in the record, which is very voluminous, and contains the record of the distribution of Saylor's estate, in South Carolina, the bill filed by Samuel P. Corbin for that purpose, and all the proceedings had therein, then the will of Mrs. Parr, the bill filed to set aside certain devises therein, and the distribution of her estate, with the long accounts of the representatives of that estate, and the testimony taken in these two bills, then the proceedings in relation to the estate belonging to Ella Gray, (now Mrs. Caruthers,) of which Samuel P. Corbin was guardian, and in relation to the actings and doings of the present executor. We will notice those points which we deem material for the adjustment of the rights of the respective parties, in relation to the property belonging to the estate of said Corbin.

1. It was insisted that the will of John J. Saylor, by the laws of South Carolina, was invalid, that it attempted to manumit certain slaves, and was, therefore, null and void. We have looked into the provisions of the laws of South Carolina on this subject, and we think that, so far as the will attempted to emancipate the slaves was concerned, this portion of it, by the laws of that State, as they existed in 1835, was invalid; but other portions of the will were not thereby affected. Consequently, while the provisions of the will, in favor of the practical manumission of the slaves, could not have been enforced, if resisted, yet the other bequests in the will were valid.

2. Again, it was insisted that Saylor's will, being contrary to the then declared policy of the laws of this State, cannot be enforced by our laws, that admitting the will to be valid in all its provisions, according to the laws of South Carolina, yet, to enforce it in Georgia, would be contrary to the policy, and prejudicial to the interests, of this State. Rev. Code, secs. 9 and 2696. We fully recognize the rule here contended for, that this State will not enforce the laws of another State, which contravene the policy of our laws; but this case does not fall within the rule. Here a will was made in South Carolina, which, according to the decision of

Caruthers and Wife *vs.* Corbin, ex'r, *et al.*

the highest tribunal known to the laws of that State, con-
ferred certain rights on certain parties, irrespective of the
provisions which, in our courts, would render the will ille-
gal. We are not called upon to enforce any illegal provisions
of the will. The question of emancipation is not, in any
way, before us. Here is a judgment of our sister State, by
a court having jurisdiction of the parties and the subject
matter, and the question is, shall the judgment of that court
be respected by our courts? Shall we mete out to the par-
ties the rights which, according to the decision of the Courts
of our sister State, they have been decided to be entitled to?
Were we called upon to enforce the illegal provisions of this
will, then other questions might arise. But such is not the
case. The simple question is, whether the judgment of that
Court shall be respected or not? If that judgment is to be
respected, what is the effect? The property of John J. Say-
loy was, by a court of competent jurisdiction, divided under
his will; and that judgment must conclude the rights of the
parties. What was the effect of that judgment? It was
that one-half of the residue of the five-sixths of the John J.
Saylor estate belonged absolutely to Mrs. Corbin and her
children, under this will, and the other half to Mrs. Parr
and her children, absolutely. There was an administration,
and a division of the property, under the will, according to
the judgment of a court of competent jurisdiction.

Mrs. Parr survived all her children, and then died, leav-
ing a will, portions of which were set aside by the proper
court, and the property divided among her heirs-at-law, Mrs.
Corbin and Samuel Saylor's children. The portion which
Samuel P. Corbin received, in right of his wife, from Mrs.
Parr's estate, was received *as heir-at-law*, and *not as legatee*
under Saylor's will. Consequently, the property was his, abso-
lutely, without liability to account to any one. The conclu-
sions, then, to which we come, on this branch of the case, are,
that the division made of the Saylor estate by the Court of
Equity in South Carolina, between Mrs. Parr and Mrs. Cor-
bin, was legal and valid, vesting one portion, or half of the
five-sixths, in Mrs. Parr and her children, and the other in

Mrs. Corbin and her children, respectively, according to the division as then made. Each ceased to have any interest in the property allotted to the other; and when the property of Mrs. Parr was paid to Samuel P. Corbin, after her death, it was freed from any trust whatever connected with Saylor's will. Consequently, the children of Samuel P. Corbin have no claim against his estate, on account of the Mrs. Parr half of the five-sixths of the residuum of Saylor's estate, nor on account of the property received from her representatives after her death. They have a claim for the half paid to him in their right, and that of their mother. The negroes willed by Saylor were sold for distribution, and Samuel P. Corbin purchased enough of them to make the portion due his wife and children, or just about enough for that purpose. The sale of the negroes was a method adopted for division, and the negroes received by said Corbin belonged to his wife during her life, and at her death, to her children. The negroes belonged to the wife and children; and when they were emancipated, the loss must fall upon the children, the owners at the time. *Hand vs. Armstrong,* 34 *Ga. R.,* 232.

3. Is the claim of Samuel P. Corbin's children such a debt as to be entitled to a priority of payment in the distribution of the assets of his estate among his creditors? Is it a debt due by the deceased, as executor, administrator or guardian, or as trustee? Rev. Code, sec. 2312, and par. 4, of sec. 2494. It is claimed that Corbin was both executor and trustee in South Carolina, and that, as such, this trust debt must have a higher dignity in the order of the payment of debts than simple contract debts. Is a foreign trustee embraced by the words of the Statute? The original Act was passed, 18th February, 1799. Cobb's Dig., 311 and 288. It is entitled "An Act for the better protection and security of orphans, and their estates." The first section makes it the duty of the Clerks of the Courts of Ordinary to enter in a book the names of all executors, administrators and guardians, appointed in their several counties, with the names of their securities, which book should, at all times, be subject to examination by the Court, or other persons

interested. The second section makes it the duty of such fiduciaries to make returns, showing the conditions of the estates, and authorizes the Court to take such steps as may be thought fit to protect the rights of parties interested. The third requires annual returns of the condition of the estates, and authorizes process to issue against delinquents. The fourth section allows guardians reasonable disbursements on account of their wards, and authorizes the binding out of wards, in case the annual profits of the estate are not sufficient for the education and maintenance of the wards. Then comes the fifth, which says: "When any guardian, executor or administrator, chargeable with the estate of any orphan or deceased person, to him, her, or them committed, shall die so chargeable, his, her, or their executors or administrators shall be compelled to pay out of his, her, or their estate, so much as shall appear to be due to the estate of such orphan or deceased person, before any other debt of such testator or intestate." The word "trustee" is not in this Act. This was amended by the Act of February, 1854, pamph. Acts, p. 70, which amends the before recited Act of 1799, and says: "That from and after the passage of this Act, the provisions of the fifth section of the above recited Act, be, and the same are hereby extended, and made applicable to the estates of all trustees *in this State*, who may have converted to their own use, wasted, destroyed, or died chargeable to the estates of their *cestui que trusts;* provided said trustees have had the actual possession, control, and management of the property vested in them as such." Take the whole of these two Acts together, and is it not most manifest that they apply to domestic, and not to foreign, trustees? The whole scope of the Act of 1799, is in relation to persons appointed by the Court of Ordinary, to act in a fiduciary character; and the object of the Act was to protect the rights of all persons who had to rely upon the Court for the selection of agents to transact their affairs; and then, by the Act of 1854, the provisions of the fifth section are "extended and made applicable to the estates of trustees in this State." This is a legislative interpretation, that the whole Act intended to apply to domestic trustees,

to such as are made so by the laws " in this State." Is not the general sense of the words, executors, administrators, etc., applicable to such as are appointed by our own laws? Our laws do not recognize foreign executors, etc., as such, at all; or rather, they did not do so prior to the Act of 1850. Cobb's Dig., 341. (The ·Rev. Code, secs. 2573–6, now authorizes them to sue in our courts.) See *Davis vs. Smith,* 5 *Ga. R.*, 295; *The South-Western Railroad Company vs. Paulk,* 24 *Ga. R.*, 370; Vaughan vs. Northup, 15 Pet. R., 1; Sto. Confl. L., sec. 513; *Jackson vs. Johnson,* 34 *Ga. R.*, 511. As the law did not recognize the existence of foreign trustees, at the time of the passage of the Act of 1799, is not this a strong reason for construing the Act to apply to such persons of the classes named as were recognized by the law as belonging to those classes? We think so, most clearly. We think too, we can see good reasons for allowing this preference as to the estates of domestic trustees, which do not apply to foreign ones.

Samuel P. Corbin died about the 28th November, 1862, and, therefore, before the Code went into effect. This case must be decided according to the provisions of the statutes existing prior to the Code. We think, however, that the same reasons apply to the Code, and that the sections therein must be construed to mean just what the law did previously. See sec. 2312, and par. 4, of sec. 2494. From all which, it follows that the claim of Corbin's children against his estate, is not such a trust debt as is entitled to a priority in the payment of the debts of the estate.

Samuel P. Corbin, in his life time, having been the guardian of Ella Gray, (now Mrs. Caruthers,) appointed in this State, and having died so chargeable, whatever may be found due on this claim is properly entitled to a priority in the payment of the debts, as contemplated by the Statute.

Sundry payments were made to Caruthers and wife in "Confederate Treasury Notes," by the executor. These payments were valid, as against the parties receiving them. Caruthers and wife were competent to contract for, and receive in payment, anything that might be agreed upon by

them and the debtor.  *Freeman vs. Bass*, 34 *Ga. R.*, 364.
The amounts received by Caruthers and wife as payments,
must be charged against them, in a settlement of the estate,
at the nominal amount so received.  They agreed so to re-
ceive the currency, and must be bound by their agreement.

As between the executor and the estate, the executor can-
not advance his own "Confederate notes" in payment of the
debts of the estate, and be allowed on settlement, the full
nominal amount, notwithstanding the "notes" were worth
but five cents in the dollar.  The executor must account for
all the profits which have accrued in his time on account of
the estate.  If he compounds debts or mortgages, or buys
them in for less than is due upon them, he shall not take the
benefit of it himself, but other creditors and legatees shall
have the advantage of it.  If an executor take upon him-
self to act with regard to the testator's property, in any other
manner than the trust requires, if there be a loss, he must re-
place it; and any gain will be for the benefit of the *cestui
que trust*.  2 Hill on Ex., 1566-7.  It is his duty to act for
the best interests of the estate, and whatever he can save in
managing the business of the estate shall go to the beneficia-
ries under the will.—Ib.  He can not use his trust to pro-
mote his own personal interest.

It was insisted that the money belonging to Mrs. Corbin
and children was paid for the Crowell place, and the children
seek to follow their funds into this land, and claim the land.
There is no doubt about the right of a beneficiary of a trust
estate to follow the funds wherever they can be traced, and
affirm or reject any unauthorized investment by the trustee.
Rev. Code, sec. 2307.; 2 Hill. on Ex., 1765.

But here the Master has found against this claim, and we
can not say that his decision is so strongly and decidedly
against the weight of the evidence as to require us to reverse
his ruling on this point.  To authorize the taking of proper-
ty purchased in the name of the trustee, it should clearly
appear that the trust funds were appropriated to the purpose
of the purchase.  2 Hill. on Ex., 1765.  The proof in this
case does not come up to this rule.

The same may be said as to the items for the board of Ella Gray, and for amounts paid for overseer's wages on Ella Gray's plantation. We can not say that the report of the Master on these items is decidedly and strongly against the weight of the evidence. The rule laid down by the Master, of taking the highest estimate of the value of cotton in the year of production, and the largest size bales, in making up the amount against S. P. Corbin, as guardian, is pretty stringent; but, perhaps, it would be wrong, in a case like this, to adopt a more lenient one. Here the guardian failed to make the returns required by law, and thus neglected his duty. He had the means necessary, and the law made it his duty to show the true amount which came into his hands. Failing to do so, he was in default, and under the circumstances, perhaps, it would not be well to lay down a different rule.

We have thus noticed all the points we deem material in these cross bills of exceptions, and laid down the rules which should govern in ascertaining the rights of the respective parties. We reverse the judgment on the grounds intimated in this opinion.

Judgment reversed.

WARNER, C. J., concurred, but wrote out no opinion.

HARRIS, J., dissenting.

I was disposed to adopt the very elaborate and, in general, satisfactory report of the Master in Chancery, of the Macon circuit, and which was approved by the Judge thereof; and to make our judgment, in these cases, conform to its conclusions, but my associates not assenting to, but rejecting, them entirely, imposes upon me the necessity of putting my dissent in writing, to *one*, at least, of the *points* ruled by my associates, and which is contained in the following summary prepared by one of them, viz: " Debts, due by a deceased executor, administrator, guardian, or trustee, entitled to priority of payment in the administration of assets, as provided by the Code, sec. 2312, and 4th part of the paragraph 2494, are such only as may be due by such executor, etc., as *may*

*be appointed by the laws of this State; trustees appointed in other States are not embraced.* Debts, due by *foreign execu-tors, trustees,* etc., are to be paid according to their character, as bonds, accounts, etc., the same as if owing by others, *with-out priority on account of such character."*

The record shows that Samuel P. Corbin, now deceased, late of Taylor county, Georgia, many years since, under *the will* of Saylor, of South Carolina, and by a decree of Chan-cery of that State, as trustee for his children, John J. Cor-bin and others, parties to one of the foregoing suits, received a large property, mostly in money, and that, removing im-mediately thereafter to Georgia, he brought with him said property, and that it remained in the possession, control and management of said Samuel until his death, in 1863. The record further shews, that two of the *cestui que trusts,* his children, were born in Georgia, since the removal of said Samuel to this State, with the trust property, that they are citizens of this State, and further, that said Samuel died in Georgia, insolvent, and deeply involved in debt, without having delivered to said *cestui que trusts* their property, or paid them an equivalent therefor, or, in any manner having accounted to them.

The amount with which he died chargeable to the *cestui que trusts* is ascertained by the Master's report, which I adopt for the purposes of this opinion.

The question, upon the facts stated, then, is whether the *cestui que trusts* have a right, as against Henry Corbin, exec-utor of said Samuel P. Corbin, to have the amount due to them, paid *before* other liens or claims, or debts due by Sam-uel P. Corbin?

I take it to be clear, that if the property of the children of Samuel P. Corbin, in his hands, as their trustee under the will of Saylor, and which was delivered to him under the decree of Chancery, had been found, upon the death of said Samuel, in Georgia, in *kind,* and capable of identification as that trust property, the individual creditors of said Samuel, upon his contracts with them, could not, to *any extent,* or in

*any mode whatever, have subjected that trust* property to the payment of their demands.

The plain and unanswerable reason for this position is, that it was not *his* property, but his *children's;* nor would a Court of Equity stop for a moment to ask *where* the trust originated, as its acknowledged jurisdiction covered all trusts, and brought all trustees living on the soil of Georgia within the scope of its remedial powers. If the trustee was alive, and a bill was filed against him, at the instance or in behalf of the *cestui que trusts,* to account for the trust property received by him, to discover how and when and into what it had been converted by him, or in what manner he had mixed it with, and used it as, his own, alleging the insolvency of the trustee, it is believed that his individual creditors, whether by judgment or otherwise, would be promptly enjoined, by a Court of Equity, from any attempt to cause the property of which he was in possession to be appropriated to their demands, *until* the trust property in his hands should have been separated from his *own* property, and paid over to *cestui que trusts;* or failing to accomplish that, from a conversion by him of the money, or other thing, so that it could not be clearly traced, *such trustee would be decreed to pay an equivalent* to the extent of the property converted or mixed up with his own, and by which the bulk of his apparent property had been increased, and this *before such individual creditors could be paid,* they being turned over for payment upon the *residue* in the trustee's hands, that being in truth and right *his* property, and *no more.* This principle of the restoration of property to its owner, unaffected by the personal contracts or debts of the person having it in possession as a fiduciary, is of universal application, and is maintained and enforced by Courts of Equity where the trustee has obliterated all means of identification, or mixed it, so that it is impracticable to separate it, specifically, from his own, in the form above indicated, that of withdrawing an equivalent in value from the bulk of the property in possession of the trustee, inaccurately called his property or estate. So that whether the trustee is living or dead, a Court of Equity employs the same means to cause

right to be done. Is it not palpable that, without the exercise of such power, the fraud or misconduct of a trustee would operate to his benefit, and most injuriously to *cestui que trusts*, by subjecting *their* property to pay *his* individual debts?

Our Legislature have not left the subject of trustees, and the liability of their estates, where they die chargeable, to rest upon the course of Courts of Equity, when applied to by individuals, but have declared a principle of justice in comprehensive, unequivocal language, that all may know their rights and liabilities, and especially that executors and administrators may know their duties in the distribution of assets which may come to their hands, without resorting to a Court of Equity for direction.

Thus, by paragraph 2312 of the Code, it is enacted that the estate of a trustee dying, *chargeable with trust funds in hand, shall be appropriated first to the payment of such indebtness, after the funeral expenses, in preference to all other liens or claims whatever.*

By paragraph 2494, under the head "of managing the estate and paying the debts of testators and intestates," the following order of payment by executors and administrators is prescribed: 1st. Funeral expences. 2d. Necessary expences of administration. 3d. Taxes. 4th. *Any* debt due by deceased as trustee, he having had actual possession, control and management of the trust property.

It cannot be questioned that the bulk of the property in the possession of Samuel P. Corbin, at his death, had been augmented by the addition to his own of the property of his children, in his hands, as their trustee.

Now I have shown that a Court of Equity, independent of our statutes, and by its mode of procedure, for the purpose of doing justice when applied to, reduces the bulk of property in the hands of the trustee, to its rightful and legitimate size, and then subjects *that residue* to the payment of the creditors of the trustee upon his personal contracts.

In *Watson vs. Watson,* 1 *Ga. R.,* 271, which was a case against the estate of a guardian who had sold the land and negroes of his ward, and mixed up the proceeds with his

own estate, I find Judge Warner saying: "The estate of Watson having been increased to the extent of the value of their (complainants') property, sold by him as their guardian, it *is nothing but sheer justice,* that the claim of plaintiffs *be paid first out of it before any other debt."* Again, "this statute," (of 1799,) "giving *priority,* is, in our judgment, *founded on a clear equity."*

I entirely concur in the soundness of the views thus expressed, and ask, is it not true here that the estate of Samuel P. Corbin was increased to the extent of the property *of the cestui que trusts,* and can it be anything but *"sheer justice"* that their claims shall be first paid out of the property in the hands of Henry L. Corbin, as the executor of Samuel P. Corbin, the deceased trustee? I apprehend my learned colleague will find it no easy task to distinguish, substantially, between "the sheer justice" which afforded relief in the one case, and refused it in the other. The only difference is in the name : one is a guardian, the other a trustee. But in equity, what does a name amount to? *Both are trustees.* We are in search of right, and bound to do right. Nothing is clearer under the heavens, than that the equities in both cases are *identical* and *equal.* Why then, should the judgments be dissimilar ?

But my associates, who cannot deny the facts as I have stated them, nor the natural equity of the *cestui que trusts,* nor the course of courts of equity, in decreeing *primary* payment, say that our statutes make provision only for the liability of the estates of such trustees as *may have been appointed by the laws of Georgia.*

I take this to be a great error. The Legislature having, by the Declaratory Act of 1790, made the estates of deceased executors, administrators and guardians, dying chargeable with trust property, *primarily liable,* subsequently impressed with the necessity of extending similar relief against *all trustees'* estates, as the equities were the same—enacted the paragraphs which have before been mentioned. My associates have, instead of giving effect to an enlarging Act, in *its widest sense,* and in accordance with its language, narrowed or re-

stricted it, so as to confine it to a very limited class, to-wit: *Such trustees as may have been appointed under the laws of Georgia.*

If this narrow interpretation be correct, upon what grounds are two of the *cestui que trusts*, born on our soil, after the trust property was brought into Georgia, by Samuel P. Corbin, to'be excluded ? *for as to them, the trust arose in Georgia.*

I can but regret this interpretation as not only unsound, but as utterly unwarranted by any of the rules employed by the best text writers in the ascertainment of legislative will. It is, moreover, incapable of being supported by even a plausible reason.

I am aware of the position occupied by my associates, that foreign executors, administrators and guardians are not included in our statutes, for the reason that those appointed abroad *are not recognized as such* in our courts; but as Samuel P. Corbin's estate is pursued, not for his default and indebtedness, as either an executor, administrator or guardian under a Carolina commission, I deem it unnecessary to discuss that question.

The question is restricted to the determination of whether the estate of a trustee, created by a deed or will, made out of Georgia, if he, subsequently bringing such property into Georgia, and here possessing, controlling and managing it to the time of his death, dying chargeable therefor, is not *primarily* liable to the *cestui que trusts, before* his other creditors. Where else can they pursue their property, mingled with the estate of the trustee, but in the Courts of Georgia? No matter of contract is involved, requiring construction according to the *lex loci. Upon what principle, then, are the remedies afforded by statutes, and which the forum administers alike to all suitors, come from where they may, denied to them?* It will not do to reply that our statutes so direct. I deny that they do, and demand the proof by those who assert that our Code sanctions the position "that debts due by trustees of foreign appointment, dying chargeable, are to be paid according to their character, as bonds, accounts, etc., the

same as if owing by others, without priority on account of such character."

This decision is not *interpretation*, but *judicial legislation.* It is an alteration of a clear, unambiguous statute, without a tittle of argument or reason to sustain it. Nor does the decision stop at the alteration of the paragraphs 2312 and 2494; but it goes further, and prescribes an order for the payment of the indebtedness of a trustee, appointed out of Georgia, dying here, chargeable to the trust which he possessed, managed and controlled, *which the statute has not.*

By what authority do they assign to debts, due by a trustee of foreign appointment, dying in Georgia, an order of payment, according to the form in which those liabilities are evidenced as bonds, notes, etc. ?

By this judicial legislation the result will be, that if the claims of *cestui que trusts* should not be evidenced by some judgment against the dead trustee, some mortgage, or bond, or note, they will go to the *foot of the list,* of the order of payment out of the assets prescribed for the direction of executors and administrators, and take their place among the account creditors of the deceased trustee.

Again, it causes a discrimination to be made, as among *cestui que trusts,* and makes it depend upon the form in which the indebtedness of the trustee exists, so that the one who has a judgment, is to be paid before the *cestui que trust,* who holds the bond of the trustee, and he who holds the bond, before the one who holds merely the note.

Now, no such discrimination can be made in cases of trustees appointed in Georgia and dying chargeable for property possessed, controlled and managed by them as trustees; for the law, by a sweeping, comprehensive declaration, enacts that for *all the indebtedness* for trust property, without regard to the form by which it is evidenced, his estate shall be *primarily* liable.

Why, in principle or common sense, should there be a difference between the liability of the estate of a deceased foreign appointed trustee and a domestic appointed one ? Our Legislature cannot be charged with either the injustice

Caruthers and Wife *vs.* Corbin, ex'r, *et al.*

or absurdity of such discriminations. The primary liability of estates of dead trustees is founded on the indisputable equity that the *cestui que trust's* property should be separated, withdrawn or accounted for in value, to its extent, *before* the individual creditors are let in for payment; but the construction here, as to the estates of trustees *appointed out* of Georgia, dying chargeable with the trust funds in hand of *cestui que trust,* is, that they come in only *pari passu,* and according to the forms in which the indebtedness to them exists, thus sanctioning the payment of the individual creditors, by contract with a trustee, *out of the property of cestui que trusts,* or that into which it was converted by the misconduct or fraud of their trustee.

The obvious intent of our statutes, was to recognize this paramount equity to *primary* payment, without the slightest regard to the shape or form by which the debt was evidenced. The Legislature looked only to the *important fact* of the trustee dying chargeable with trust funds in hand, and placed, by the words and spirit of their Act, all *cestui que trusts* upon the same *equality,* without reference to any other consideration than that the property of which he, as trustee, died possessed was theirs, or rather that their property should be so separated, *first* from *his* property, and when this shall have been done, then that his idividual creditors, on *his personal contracts,* should, according to the grade of their claims, be paid out of *his* property left after the separation from the trust property or funds.

The majority of this Court have *associated* with deceased executors, administrators and guardians, appointed out of Georgia and dying chargeable with the funds of the estate in their hand, *trustees appointed abroad,* and dying here, chargeable with trust funds.

This has been done, not by the Legislature, but by the court. The association is a forced one, and as the majority have, virtually interpolated the Act of 1799, by restricting the *primary* liability prescribed by it to the estates of executors, administrators and guardians as were appointed *under the laws of Georgia*: so too, with less reason, and of their

own will, have they likewise virtually interpolated, in paragraph 2312 of the Code, after the words "the estate of a trustee," the words "appointed or created in Georgia only," and in paragraph 2494, after the words "or any debt due by the deceased as trustee," the words "created or appointed in Georgia only."

I do my associates no injustice when I assert that their decision carries on its front the evidence of *unauthorized legislation by them*, and as effectually introduces into those paragraphs, and incorporates their opinions therein as substantially as if it had been by the law itself enacted, the *restrictions which they have made*.

Nor can my associates derive, in support of their decision, an argument from the maxim *noscitur a sociis*, as the Acts in reference to executors, administrators and guardians, are entirely separate from those touching trustees.

The Act of 1799, providing for the *primary* liability of the estates of executors, administrators and guardians, embraced only the specific class comprehending them. The subsequent legislation extended to the *genus* trustees of every other kind, the same provision made as to the specific class.

I conclude by saying that to me it is a source of amazement, that my associates should have overlooked the very plain, palpable and unanswerable reason, which must have influenced the Legislature to declare that "the estate of a trustee, dying chargeable with trust funds in hand, shall be appropriated, *first* to the payment of such indebtedness after funeral expenses, in preference to *all other liens or claims, whatever*." It felt that it was but "sheer justice," as the estate of the deceased trustee had been increased to the extent of the value of the *cestui que trusts* property used and converted by him as their trustee, that their claims should be paid *first* out of his estate, before any other debt. It felt, that to give to all *cestui que trusts* a priority of payment, was but a recognition of "a clear equity."

This must have been the reason which led to this enactment. Could any one be more ample and satisfactory, commending, from its natural justice, itself to the approval of

Caruthers and Wife *vs.* Corbin, ex'r, *et al.*

every honest heart? and if it be the true reason, it is, *per se*, a condemnation of the miserable and odious discrimination made between trustees of foreign and domestic origin, by the *judicial legislation* in these cases, and against which I enter my protest.