ENGLISH *vs.* THE BANK OF THE STATE OF GEORGIA.

[This case was argued at the last term, and the decision reserved.]

A bank held certain jewelry. In order to get possession of it and carry it to his store, one S. obtained a written guaranty from the president, who was also the principal stockholder of the bank, and one E., to the bank, on March 22, 1877, one mode of discharging which was by "the faithful return of said goods." They were returned to the bank and placed in its vault under the control of its cashier. S. desired to obtain them, in order to offer them for sale in another city, but the bank cashier refused to allow him to have them without E. came down to the bank and made a guaranty in person, or without his signature. E. wrote the following note to the president of the bank, dated March 30: "Mr. Sharpe informs me that he wants to go to Augusta and take your goods; any arrangement you make with him for us will be satisfactory to me," etc. The president thereupon agreed in parol that he and E. would be jointly responsible to the bank. The president took a receipt from S. to himself and E. for the goods, providing that the goods should be sold for their account, and that S. would pay over the proceeds. The goods were delivered to S., who absconded with them. The bank brought suit against its president and E., and a verdict was rendered in its favor over the defence of E.:

*Held,* that, whether the contract of March 30th be considered as reviving the written contract of March 22d, or as making a new contract of guaranty, as between the guarantors and the bank, the

parol agreement of the president was necessary to make it a complete contract. His co-surety was entitled to a valid binding contract, on which he could require contribution; but the parol agreement of the president with the bank was not sufficient for that purpose, and therefore E. would not be bound.

(*a.*) The charge set out in the 7th ground of the motion and the refusal to charge as requested in the 4th and 5th grounds, as well as the general view of the law of the case indicated in the charge, in so far as contrary to this decision, were erroneous.

(*b.*) The double agency of the president, at once representing the interest of the bank and acting to bind E., is not valid.

(*c.*) As the record now discloses the facts, the verdict is contrary to the evidence.

(*d.*) E. stands in this transaction as an accommodation endorser or surety.

March 9, 1886.

Contracts. Principal and Surety. Guaranty. Principal and Agent. Before Judge HAMMOND. Fulton Superior Court. March Term, 1885.

The Bank of the State of Georgia brought suit against J. W. English and F. M. Coker, alleging that one George Sharpe, Jr., sold to the bank a lot of watches, diamonds and jewelry; that he was anxious to have the privilege of selling these articles at retail, paying to the bank the cost price with a reasonable addition thereto, and retaining the balance for his services; that the bank was willing to let him have the goods, provided English and Coker would bind themselves to see that the property or the proceeds of its sale was returned to it; that they wrote to the bank the following letter:

"ATLANTA, GA., March 22, 1877.
"*Bank of the State of Georgia, Atlanta, Georgia:*

At our request, you will deliver to George Sharpe, Jr., the two bills of goods attached to this paper, being fully described in said bills, consisting of diamonds, watches, jewelry, etc., and amounting in the aggregate to $10,764.70, the same being the property of said bank, and paid for with its money, to sell on commission, and held in trust for our account and risk, and we agree to and hereby bind ourselves for the faithful return of said goods or the money for them as sold, on demand, or so much as may be due said bank on the above stated goods.                                              "F. M. COKER,
                                                             "J. W. ENGLISH."

That upon the faith of this guaranty the property was delivered to Sharpe; that on March 30, Sharpe desired to take the goods to Augusta, and the bank consented thereto, provided Coker and English also consented; that Coker consented verbally, and English wrote to Coker, who was president of the bank, the following letter:

"March 30, 1877.

"Mr. F. M. Coker:

Dear Sir—Mr. Sharpe informs me that he wants to go to Augusta and take your goods; any arrangement you make with him for us will be satisfactory to me. I am very busy or I would see you in person.

Yours truly,                    J. W. English."

That on the faith of this letter, and with Coker's verbal statement of consent, the bank agreed for Sharpe to take the goods in trust to sell upon commission; that Sharpe absconded with the property, and thereupon suit was brought against Coker and English.

The evidence is sufficiently stated in the decision.

The jury found for the plaintiff $5,848.14, principal, and $3,702.13, interest. By consent of plaintiff's attorney, $363.38 of the interest was written off. Defendant, English, moved for a new trial, on the following among other grounds:

(4.) Because the court erred in refusing to give the following charge to the jury : " The plaintiff sues on the agreement of March 22d and March 30th, 1877. If you find from the evidence that the goods were delivered to Sharpe under the agreement of March 22, and that afterwards Coker got uneasy, and the goods were returned to the bank, that agreement would be at an end, and not be longer binding, and there could be no recovery on that agreement; and as the suit is based on that agreement, there can be no recovery in this case.".

(5.) Because the court refused to give the following charge to the jury: " The suit is based on the two agreements of March 22d and March 30th, and there is no allegation that the goods were delivered to Sharpe on any

other agreements, and there can be no recovery on any other agreements. If Coker's agreement to be responsi-ble to the bank was a verbal agreement, it would be void and not binding on Coker, and if Coker was not bound under the agreement, then English would not be bound."

(7.) Because the court charged as follows : " If the lia-bility of English on that obligation became extinct by the return of the goods to the bank, then, if the bank after-wards delivered the goods to Sharpe to carry to Augusta to sell for its account, it would be your duty to inquire whether English's liability became revived by reason of anything that occurred between the parties. If you believe from the evidence that English gave written authority to Coker to make any arrangement for him that he might see proper with Sharpe, in reference to taking the goods to Augusta, and if Coker made an. arrangement with the bank, for himself and English, by which the goods were delivered to Sharpe to take to Augusta, under the author-ity granted him by English in that writing, and if he agreed with the bank for himself and English that the ob-ligation which had been given by him and English to the bank on the 22d of March, 1877, was to be and remain of force, and under that the goods were delivered to Sharpe by the bank to be taken to Augusta and sold by him, then that obligation would be revived and would be in force, and if Sharpe absconded with the goods, and the bank thereby suffered loss, it could recover its damages out of Coker and English."

The motion was overruled, and English excepted.

HOPKINS & GLENN, for plaintiff in error.

JULIUS L. BROWN; CANDLER, THOMSON & CANDLER, for defendant.

JACKSON, Chief Justice.

A suit was brought by the Bank of the State of Georgia

against James W. English and F. M. Coker to answer to certain matters of complaint and indebtedness arising thereon by reason of certain obligations of suretyship or guaranty incurred by English and Coker in behalf of Geo. Sharpe, Jr., in the sale of certain jewelry for the said bank, turned over for sale to Sharpe by the bank upon said guaranty, that the proceeds of the sale, or so much as may be due said bank, or the jewelry itself should be returned to the bank. English pleaded that he was not so indebted to the bank, and upon this issue the jury found against him. Thereupon, certain errors of law on the charge of the court and the refusals to charge are made on the denial of a new trial, and these bring the case here.

Coker, the other surety, is the president and controlling stockholder of the bank, and acted with the bank in the suit, and of course made no defence and does not complain of, or except to, the verdict, which is against both.

The declaration sets out the facts at length and with particularity, setting out the writing signed by English and Coker on the 22d of March, 1877, making the guaranty above alluded to, and a written note or authority from English to Coker, dated the 30th of March, 1877, to the effect that Sharpe wished to take the goods to Augusta, and that any arrangement he, Coker, made with him for the two would be satisfactory to the writer; and other averments that, upon the faith of that letter and of Coker's verbal statements of his consent, it (the bank) consented that said Sharpe might take the goods to Augusta, and that English and Coker, since Sharpe absconded, have time and again said that he had gone to parts unknown, and that they are unable to re-deliver the goods, and yet refuse to pay their value, and that they have often refused, and still refuse, to pay, and that by virtue of said guaranty and of the premises, an action has accrued to it to recover from them ten thousand seven hundred and sixty-four and seventy one-hundredths dollars, besides interest from

said March 30, 1877; wherefore petitioner prays process to answer said matters.

So that it appears from the declaration that the suit is based upon the two transactions of the 22d and 30th of March, 1877, and the controlling question is, whether or not English is responsible to answer and respond to the bank upon these contracts, under all the facts of the case; and upon the trial of that controlling issue, whether or not the law of the case has been given to the jury by the court.

Accordingly the main allegations of error pressed by the counsel for plaintiff in error, all gravitate towards, and bear upon, a single central thought, and that is whether English is longer bound upon the guaranty of the 22d of March, when the goods were returned to the control and custody of the bank prior to the 30th of March, and parted with by the bank in such manner as no longer to bind him; or, in other words, whether by the contract enabling Sharpe to take the jewelry to Augusta, the bank, in law, released English—not intentionally, of course—but in the necessary and inevitable legal effect of that last contract in its want of binding force on English, or on Coker, the co-surety of English, and thus on the latter.

It may be well to look at that transaction of the 30th of March, 1877, and to ascertain from the evidence exactly what it was.

English's note to Coker before the contract of 30th of March was made, and of that date, and authorizing Coker to make it for English as well as for himself, is in these words:

"MARCH 30, 1877.

"MR. F. M. COKER: Dear Sir—Mr. Sharpe informs me that he wants to go to Augusta and take your goods; any arrangement you make with him for us will be satisfactory to me. I am very busy or I would see you in person. Yours truly,    J. W. ENGLISH."

It needs no argument to show that the words "your goods" mean the bank's goods. Coker being president and

ruling stockholder of the bank, English says "your goods"—that is, the bank's goods; and Coker being co-surety of English to the bank, he says "for us;" that is, when he talks of arranging to let Sharpe go to Augusta with the bank's goods, he then authorizes Coker to make the arrangement for you and me, the bank's sureties for the return of, or payment for, the jewelry.

The following receipt was given by Sharpe for the jewelry, in pursuance of the letter of authority just set out, and in response to, and consummation of, the arrangement authorized by English, and made verbally with the bank by Coker:

"Received of James W. English and F., M. Coker the foregoing list of goods, diamonds, watches, jewelry, etc., as described on this and the two opposite pages of this sheet, which I am to hold in trust and for sale for account of said Coker and English, they allowing me to take same to Augusta, Ga., for sale for their account, and agree to hold the same carefully and cautiously, and to return the same within one week from date, all that I do not sell, and to pay over the money that I receive for that I sell, to be sold at not less than twenty-five per cent. discount from list prices as hereon stated on list.

"Atlanta, Ga., March 30th, 1877.

                                        G. W. SHARPE, JR."

"Attest: WM. L. PEEL, N. P."

According to Peel, the cashier of the bank, that verbal contract is about to this effect: That English and Coker were to be bound for the goods as in the former case; that first, English was sole surety for Sharpe to take the goods to his store in Atlanta, and afterwards English and Coker were jointly bound for them to be taken to that store, and after that English and Coker were to be bound for them for him to take them to Augusta.

In reply to the question, "That was Mr. Coker's verbal agreement to be bound as above?" Peel answered, "Yes, sir."

In reply to the question, "Did that letter have anything to do with it? Peel replied, "Yes, sir; we refused to let him have them. Mr. Sharpe said Mr. English would come

down and sign the papers next morning, and we told him he must bring Captain English or get his signature; we couldn't let him have them without that, and he went off, and we expected him to bring Captain English, but he brought this note, and on that we let them go."

In answer to the question, " He had been there two or three times trying to arrange to get them ? " he replied, " Yes, sir ; " and in response to this, "And finally brought this note ?" his reply was, " Yes, sir ; " and further, in re- sponse to this, " I understood you to say it was on faith of this verbal arrangement made by Mr. Coker and that note that you let these goods go to Mr. Sharpe to carry them off?" he replied, " Yes, sir. " And in response to this, " Without that he couldn't have got them ? " his response was, " No, sir, he couldn't."

All this was brought out by the bank in questions put by it to its cashier.

On the cross-examination, in reply to the question, " He could have let Sharpe have them without your knowl- edge ? " he answered, " No, sir ; I had charge of them, and collaterals and all that ; " and in reply to this, " Do you mean that if Mr. Coker had told you to turn them over, you would, in any event, have refused ? " he answered, " Yes, sir ; " and to this, " Why ? " he answered, " Because I would, unless he would make it all right; " and to " How all right ? " he answered, " By becoming bound for them ; " and further, he stated in reply to questions put by counsel for English, that these goods were delivered March 30th ; that they were in the vault of the bank, and had been there two, three or four days ; that witness had gone over to Sharpe's and taken them to the bank and put them in the vault; that Sharpe came to get them on the morning of the 30th, but he would not let him have them without the proper showing, and told him that he must get English and Coker to stand for him again, and on his return, Sharpe said English would come down in the morning and sign the papers ; that Sharpe was talking

to him, witness, and Coker, when trying to get the goods, and went off and brought English's note, and then Coker said he would be bound for the other half—undivided half,—and then he, witness, delivered the goods to Sharpe and took the receipt for them; that he, witness, was acting for the bank and representing its interest in talking about letting Sharpe have the goods and requiring Coker to say he would be bound for half the goods which then the bank had in the vault, and he, witness, wanted Coker and English to become security if Sharpe got them out.

Thus it appears quite clear to us that Sharpe had returned the goods to the bank between the 22d and 30th of March, and that the goods were safely deposited in the vault of the bank, and that Sharpe could not get them out of the possession of the bank in order to try the Augusta market to sell them without the assent of the bank, and some contract satisfactory to the bank. It is equally clear that, when Sharpe did return them to the bank, the owner of them, between the 22d and the 30th of March, 1877, and the bank received them and put them in its vault and controlled them again as its property so returned, refusing to let Sharpe get possession of them again except on terms satisfactory to the bank, the contract of the 22d of March was fulfilled by the return of the jewelry to the bank by Sharpe, payment in the jewelry itself was made to the bank by him, and Coker and English, his sureties, were discharged from further obligation under that contract. One of the modes of discharging that contract of the 22d of March is " the faithful return of said goods," which is made as complete satisfaction of Coker's and English's guaranty as the money, if Sharp had sold them, or so much of it as might be due the bank, by the very terms of the contract of these sureties. It is unnecessary to apply the rule of "*stricti*" or "*strictissimi juris*" for their benefit, for the plain words of the contract of the 22d of March make that return the fulfillment of their obligations.

It follows that, before these sureties could be bound

v 76-35

again on the restoration of the possession of this jewelry to Sharpe, they must make a new valid contract to bind them to pay the debt of another as guarantors, and that contract, to be valid, must be in writing. Hence, the refusal of the bank, through Peel, its cashier, and highest officer *quoad hoc*, Coker being one of the sureties and interested on the other side, and backed, too, as Peel was by Coker, the president, though on the other side; hence the bank's refusal, though importuned a whole day by Sharpe to do so, to let him have the jewelry until these sureties were bound again. Hence, the solicitude to get English's signature to whatever contract was made; hence the rejection of his verbal promise, through Sharpe, to sign the next morning, and the demand for a writing from him, and hence the delivery of the jewelry to Sharpe, on the strength of his note to Coker, backed by Coker's verbal promise to be bound, too. The bank's faith in its president reposed on the mere word of that officer that he would be bound; but very properly its confidence in a stranger did not rest securely unless it lay on the legal written obligation of English. That note to Coker, signed by English, gave repose to the bank's caution, and the question comes back to this: does that note authorize another contract with the bank; and if it does, will a verbal contract with the bank for both, made by Coker, bind English, or will English be bound, if the note gives authority to Coker to bind him together with Coker as co-surety, when Coker himself is not bound in writing to the bank, but only by oral promise?

Strictly construed, the note of English to Coker might be construed to give authority to arrange with Sharpe—not with the bank—and the contract, to be valid, must be with the bank. Taken in connection with the words " your goods," alluding to the jewelry as the bank's goods most probably, the intention of English, drawn from a fair construction of the words, was that he empowered Coker to act for him in respect to the bank's power over the goods, and its interest in them, as well as to Sharpe's getting

MARCH TERM, 1886.                    547

English vs. The Bank of the State of Georgia.

possession of them, to go to Augusta and sell them. But when we read the receipt given by Sharpe on the 30th of March, when he got the goods from the bank to carry them to Augusta, it relates solely to Sharpe's contract with English and Coker, and not a line or word in writing has the slightest reference to the bank. It is no contract with the bank. That contract is outside of this receipt. It is outside of the note empowering Coker to act for him, written by English. It stands wholly in parol—outside of the contract of the 22d of March, too ; or if part of the contract of the 30th with the bank be in the note of English or the receipt of Sharpe, or the contract of the 22d, it gets into each and all of them by the verbal agreement of Coker and Peel, made when the jewelry was taken from the vault and delivered to Sharpe on the faith of the note of English and the verbal promise of Coker.. And a very singular transaction it was, its peculiarity springing from the fact that one man represented, in part at least, and powerful part, if not with absolute will, the bank, as its president. and primal agent, and his absent co-surety, as his agent also. Such a double and antagonistic agency is not in conformity to law, and is wholly unlike the case of a broker, or other disinterested agent of two parties, with no interest. in either further than to secure fees for his labor. The authorities are to the effect that Coker, as president of the bank and its *alter ego*, cannot make a valid contract between it and English, as agent for English, too. The case at bar illustrates the danger of such agency, for Coker's eyes were upon securing the bank, rather than arranging the best he could for English.

But passing by its singularity, it is not easy to see how a contract in parol, or that. link of it that is absolutely necessary to make the items in writing parts of the contract between the parties at issue—resting in a verbal agreement—can bind sureties or accommodation guarantors, or make them liable as such. Whether the verbal agreement of the 30th revived the written agreement of

the 22d, or made a new agreement in connection with the note of English and the receipt of Sharpe of the 30th, it still is down with the same complaint. It can neither revive a dead, defunct, paid-up contract verbally, nor can it make a new obligation of guaranty or security. So that it is immaterial whether that verbal arrangement tried to do the one or the other, it had no legal vitality to do either.

But even if this were all unsound, we do not see how English could be bound, unless Coker was; and that Coker's promise was absolutely worthless, being a mere verbal promise to be surety for an undivided half, is too clear for argument beyond the mere statement of the fact. No matter how much faith the bank had in Coker's verbal promise, English, too, was interested in the matter to the extent of one-half the liability; and perhaps his confidence was not so great. He is entitled to contribution from Coker, and to have from him a legal, binding, written promise as co-surety with himself. This verbal promise, to himself as president and to Peel as cashier of the bank, would hardly enable English to recover, in law, from Coker contribution, when the bank forced all the debt out of him.

It follows from the conclusions above reached by this court that the court below erred in the charge as given in the 7th ground of the motion and the refusal to charge as requested in the 4th and 5th grounds of the motion, as well as in the general view of the law of the case indicated in the charge, wherein anything is said in antagonism to the views above expressed.

It will be observed that the above opinion rests in great part upon the agreement as testified to by Mr. Peel and the facts narrated by him touching the occasion and time and manner of the return of the goods to the bank. His account of it is not contradicted by Mr. Coker, but is confirmed in so far as the verbal arrangement to allow Mr. Sharpe to retake the goods from the bank on the 30th is concerned, while he thinks Mr. Peel mistaken as to the

time Sharpe returned them to the bank, but fails to remember distinctly himself about it, while the book-keeper of Sharpe confirms the recollection of Mr. Peel. It is not very material when they were returned, or how long the bank had them. The question is, did the bank get them back as its property, and before Sharpe could get them, was a new bargain made with Coker and the bank and Peel, and did that bind English?

The suggestion that the jewelry was returned only to be checked is hardly worthy of consideration, so far as the facts of this record go. We do not see any but vague and unreliable testimony to that effect. Peel was the man who was sent to check the lists; he did it at the store, he himself swore; he directed the goods to be returned; they were in his custody and control, even over President Coker, because of his interest as surety for Sharpe. They were put in the vault of the bank by him, and taken out of it the same way, and he knew and ought to know more about it than anybody else. He is a man of unquestionable character and veracity, wholly disinterested now, having left this bank, and is sustained in respect to the time when the goods were returned, two or three days before the 30th, by the book-keeper at Sharpe's store. Besides, why were the goods in the vault of the bank, if brought there merely to check and see all was there? Rather a curious place to put them for a little while just to check them.

Moreover, Sharpe was about to run away; he did abscond that very night with these goods. If they were in his own possession and control, and not in the bank's, why did he not take them off without leave from the bank? The bank had them, it controlled them, and therefore their leave and a contract with them and English's signature or written authority were necessary to Sharpe's purpose to run off with them.

So that, as the record now stands, a verdict that the jewelry was only brought to the bank to be checked, and

was not then and there recognized as its property and in its possession, having been delivered up to it merely to take an account of it at the bank, would be overwhelmingly against evidence and without sufficient evidence to support it.

What additional evidence may be brought to bear on it; we do not know and cannot foresee; but we think the conclusion reached from that in this record, that the goods had been restored to the bank, and were in its absolute possession on the 30th of March, 1877, is irresistible to any fair mind in search of truth.

We think, therefore, that a new trial must be awarded, because the law of the case, arising out of the facts of the case as made in the record before us, has not been given by the court or reached by the jury in the verdict rendered.

Perhaps it is well to add that this contract on the part of English is no guaranty for value or consideration to himself, but the consideration was benefit to Sharpe, a third person, and a mere accommodation, and he stands on the footing of an accommodation endorser or a surety. DeColyar on Guaranty and Prin. and Surety, pp. 66, 152, *et seq.*, Rule iv; *Wright vs. Shorter*, 56 *Ga.*, 72–76; Code, §2148.

On the point of the double agency of Coker, and his incompetency to act in that capacity, see, cited by plaintiff in error: Brown Stat. Frauds, sec. 367; Brandt on Suretyship and Guaranty, sec. 76; 2 Campbell, 203; 5 Barn. & Ald., 333; 4 *Id.*, 443; 45 Mo., 444; and see also DeColyar on Guaranty and Prin. and Surety, p. 193, and 60 *Ga.*, 221, *Mayor, etc., of Macon et al. vs. Huff.*

On the insufficiency of the verbal contract of Coker to bind English, see Code of Ga., §1950, sub sec. 2; 63 *Ga.*, 67; Code, §§2170. 2173; DeColyar on Guaranty and Prin. and Surety, p. 206; *Smith vs. Jones*, 66 *Ga.*, 338; *North & Co. vs. Mendel & Bro.*, 73 *Ga.*, 400; 1 Smith's Lead. Cases, 6 ed., p. 283, and Wilkinson *vs.* Evans, L. R. 1 C. P., 407.

The questions discussed and ruled above in this opinion control the case as made in this record; and unless additional facts throw other light upon the case, they must control it always. Therefore it is unnecessary to notice other points. In the briefs of the able and industrious counsel of defendant in error, we see nothing overthrowing the legal positions we adjudicate. We subjoin their citations.

See, also, *Hartridge vs. Sav. Bk. & Trust Co* , 75 *Ga.*, 149.

Cited for defendant in error : 60 Am. Dec., 760 ; 54 *Id.*, 299 n; 18 Ill., 109 ; 7 Am. Dec., 44, 286; 12 Mass., 137; 12 Johns., 102; 5 N. Y., 229; 19 Pick., 502; 9 Leigh, 387; 15 Mo., 365 ; 24 Ill., 329 ; 56 *Id.*, 233 ; Code, §§3332, 2141, 3030, 3065 ; 61 *Ga.*, 147; Code, §2148 ; 57 *Ga.*, 193; §§2178, 2179, 2182 of Code ; §1951 Code; 55 *Ga.*, 277 ; 60 *Id.*, 456 ; 40 *Id.*, 65 ; 45 *Id.*, 138 ; 57 *Id.*, 443 ; 58 *Id.*, 115 ; 59 *Id.*, 472 ; 61 *Id.*, 131, 168 ; 62 *Id.*, 11, 53 ; 63 *Id.*, 326–610.

Judgment reversed.