MAYOR AND COUNCIL OF THE CITY OF MACON *et al. vs.* HUFF.

1. H. was mayor of Macon and *ex-officio* president of council. Whilst in office he contracted with council to lease the city park for five years; and for an annual sum paid him to fence, drain and keep the same in repair for that period:

*Held,* that as it was his official duty as mayor to see to it that as contractor he discharged the duties·of this executory and continuous contract for five years, public policy forbids that he take a contract

which it is his official business to see faithfully performed, and that therefore the contract is illegal.

2. Although a mayor and council, of which he is not a member, might ratify such a contract, inasmuch as such mayor and council could legally have contracted with him *ab initio*, no act of the city through a council of which he was the official head can operate as such ratification, and inasmuch as he is still at the head of the government of the city, no act yet done or left undone can, by deed or acquiescence, have the effect of legalizing the contract.

3. Equity, however, ·requires every litigant who seeks her aid to do equity; and inasmuch as the defendant has expended large sums of money in fencing, levying, draining and ornamenting the park, of which the city has received the benefit, equity will not interpose in behalf of the complainant to·annul and set aside the contract, though thus illegal, unless the complainant shall first do equity, and to do equity the city must pay the defendant the money so expended and interest thereon, and thus restore him, as far as practicable, to his *statu quo*, in the absence of actual fraud on his part.

4. Whilst these are the leading principles which will control the adjudication of this case on the final hearing on the merits, yet the chancellor need not, by interlocutory decree or order, grant an injunction or appoint a receiver until the hearing, where the facts set up and proven by answer and affidavits to his satisfaction, show that neither are necessary to secure the ultimate rights of the complainant—the proof being that the park is well kept and open to the use and enjoyment of the people of the city, and that the money already expended by the defendant is in excess even of the estimate of the city of the value of the rents of the park.

5. Inasmuch as the bonds required by the chancellor are of comparatively insignificant amounts and seem to hurt neither party, his discretion has not been abused in the judgment rendered as a whole, and the same is hereby affirmed.

Municipal corporations. Officers. Contracts. Equity. Injunction and receiver. Before Judge Grice. Bibb County. At Chambers. January 19th, 1878.

The following, taken in connection with the opinion, sufficiently reports this case :

Complainants, in addition to the averments as to the main issue, alleged that Huff had, without authority, made and signed officially a note to the City Bank for $2303.00, on which the city had been sued ; that the city was not prop-

erly liable therefor, but if judgment should be recovered against it, the amount would prove a total loss, as Huff was insolvent. There was a prayer that if anything should be found due by the city to Huff, whether on account of his salary or otherwise, it be first applied to the payment of the claim of the City Bank.

Defendant, after denying complainants' allegations in regard to the note held by the City Bank, and alleging that it was given in lieu of another note indorsed by him as mayor, which had been discounted at the bank and the proceeds used for the benefit of the city, and denying any danger of loss on the part of the city both because the suit could be successfully defended and because if otherwise, he was able to answer to the city for the amount of loss, tendered a bond for that purpose.

The chancellor refused the injunction and appointment of receiver prayed for in the bill, but accepted the bond tendered by defendant for $4000.00. He also ordered that if complainants should except, the original restraining order should remain of force until a decision by the supreme court, upon complainant's filing a bond for $2000.00 payable to defendant for damages and costs.

WHITTLE & WHITTLE; R. F. LYON; NISBETS & PIERCE; G. W. GUSTIN, for plaintiffs in error.

BACON & RUTHERFORD; LANIER & ANDERSON, for defendant.

JACKSON, Judge.

Whilst Wm. A. Huff was mayor of the city of Macon and *ex-officio* president of council, he leased the city park for five years, paying in advance so much per annum therefor, and agreed to erect certain levies, build and repair fences, grade and gravel walks, and to put and keep the park in repair, and to cut and furnish wood to the poor from what is called the new park, for the sum of three thousand

dollars per annnum for the term of five years. There were two contracts made at different times and in respect to different but adjoining tracts of land, known as the park and the new park. These contracts were made in 1875 and 1876, and the same principles of law will cover both. In the fall of 1876, in December perhaps, Huff was re-elected mayor, but a new council was then elected, and a majority of the aldermen, eight out of twelve, (which was the whole number), brought a bill against Huff to annul and set aside the contracts, and until the hearing to appoint a receiver to take charge of the park, and to grant an injunction restraining Huff from interfering therein, and collecting rents therefor, etc., etc. The chancellor refused to appoint a receiver or to grant an injunction on Huff's giving a certain bond which he had offered to give, and he also required the city to give a comparatively small bond of two thousand dollars ; and the questions are, did the chancellor err in refusing the prayer for a receiver and injunction until the hearing, and in granting the order which he did grant?

1. The first question, and the great question argued before us with great research and ability by the able counsel on both sides, is this, could Huff, whilst mayor of Macon, and *ex-officio* president of council, make the contracts which are set out in the record, and legally bind the city thereby?

The fundamental principle which will be found to underlie all adjudications made in this state on similar questions, and which, we think, has not been upset by any well considered case anywhere, is that no officer or agent, public or private, whose duty it is to supervise a contract in behalf of his employers or principal, can himself undertake to do that thing which his office or agency makes it his duty to supervise for others, and to see to it for them that it is well and faithfully done. The reason is too plain and palpable for serious dispute. The man becomes a judge in his own case. He agrees to perform work himself, and yet is to judge whether or not it is well done. So tender is our law of bias on the part of the noblest and purest in behalf of

self-interest, that no judge is permitted to sit in a cause in which he has any interest. If a relative by blood or marriage within a certain degree, is interested, he cannot sit and determine the case. The same principle applies to jurors and to all courts, federal, state, or municipal. Ever since the Yazoo fraud, this has been the policy of this state. In 1801 an act was passed " that no judge or justice of any court, no ordinary, justice of the peace, nor presiding officer of any inferior court or commission, can sit in any cause or proceeding in which he is pecuniarily interested, or related to either party within the fourth degree of consanguinity or affinity, nor in which he has been of counsel." See Code, §205. Cobb's Digest, 460. Therefore, in the mayor's court of the city of Macon, Mr. Huff could not sit in a cause between himself and the humblest citizen of the city, involving the slightest breach of propriety or the smallest amount of money. Yet the effect of these contracts is to make him every day the judge in his own case. He has contracted for money to do certain work for' the city, and as mayor of the city and its chief executive officer, it is his official duty to see that this work is well done. He contracts to cut and haul wood to the poor, to fence and keep in repair the fencing of a very large piece of ground, involving, heavy and continuous expense, to levy the river or drain the lagoons and keep the park dry as far as practicable, to gravel the walks and keep them in order, in fine, to keep the whole park in perfect order for the term of five years. His administrative and executive duties as mayor require him to overlook and judge of' the extent and manner in which, as contractor, he discharges these obligations. Can he do it disinterestedly? Possibly he may ; but the law regarding our fallen nature as all weak, and profiting by the prayer which the Son of God prescribed for all men, forbids that such temptation be laid in the path of any man, however exalted his office or pure his character. How would it look for governor Colquitt, while in office, to lease for himself the penitentiary convicts, or the state road, or

Macon and Brunswick road, when it is his official duty to
see to it that the lessees carry out faithfully their contracts
with the state ?   It will be observed that these contracts with
Mr. Huff are executory and continuous—that the contract
is not executed in its totality on his part, but he obligates
himself to do things day by day for the entire term of his
contract.

It matters not how fair the contract may be ; public policy
will not uphold it.   This principle is iterated and reiterated
everywhere in the books.

Hence, the principle decided in the South Carolina case,
in 9th Richardson, 399, Albright & Pinchback *vs.* The Town
Council of Chester, does not cover this case.   The contract
there was upheld, though made by the intendant with the
council while he was intendant ; but it was fully executed—
the work was done, and the suit was for the value thereof.
Certainly there ought to have been a recovery on a *quan-
tum meruit*, if the contract was set aside.   The work was
done, and done according to contract, and it does not appear
that the intendant was to be the judge of how it was done.
Perhaps he was, as, being the executive officer of the town,
it was in the line of his duty to supervise the streets.   If,
however, it were necessary to collide directly with that case,
great as is the respect entertained for the distinguished and
learned judges who then presided there, we should be forced
on principle, and the policy of this state drawn from the
current of its legislation from the date of its independence
to this day, to differ with that court in that case.   Judge
O'Neal simply said, "I agree to the principle laid down by
my late friend, chancellor David Johnson, in the Railroad
Company *vs.* Cleghorn *et al.*, Speer's Eq., 562 ; there is noth-
ing in law or equity which forbids a member, or even a
director, of a corporation from contracting with it ; and,
like any other individual, he has a right to prescribe his own
terms, which the corporation are at liberty to accept or re-
ject, and, *when the contract is concluded*, he stands in the same
relation to the other creditors of the corporation as any other

individual would under the same circumstances." That is the whole decision, except the addition, that "the jury have decided that the work was done according to contract."

On turning to the case referred to—1 Speer's Eq. R., 545—it will be apparent that the case did not cover the case in 9 Richardson, nor does it touch, as we think, the case made here by these contracts. That case simply involved the indorsement of paper by certain persons who were alleged to be directors of a private corporation, and the question whether the chief executive officer of a municipal corporation, whose duty it was to see to the enforcement of a contract made with the municipal corporation, to be executed or performed in the future, was in no way involved.

The case in 9 Richardson is the only one directly in point which has been cited, and then the contract had been performed and the suit was for money after service rendered; nor does it seem to have been thoroughly considered, especially in the view taken by this court of this continuous contract. It will be seen, too, that the case in 9 Richardson was the case of a partnership, of which the intendant was a member, against the town. Perhaps that fact may make some difference—as the partner may have made the contract, and the intendant's skirts have been clear.

On the other hand, in addition to the codification of the act of 1801, our own Code, section 364, codifying the act of 1850, declares in express terms that no sheriff or *other officer discharging a similar duty* shall purchase at his own sale. That sale is public, known to all, duly advertised, yet he cannot buy; if he had to lease out work yet to be performed, could he be the lessee, or could any officer discharging a similar duty? We think not. The reason for prohibiting the mayor from making such contracts as these thus appears to be stronger than the law which prohibits the sheriff from purchasing at his own sale. So section 796, codifying the act of 1872, expressly prohibits any municipal officer from contracting with the corporation to do work for pay out of the treasury; and whilst that act

was declared by this court, in the case of *Ayeridge vs. Social Circle*, unconstitutional, because it contained two subject matters, yet it shows the spirit of our legislation and the policy of our legislators. But even before the Code or the act of 1850, the same thing in principle was held; indeed, this court went further and held that a sheriff or other public officer could not even act as the agent of another to buy for that other at his sale—9 *Ga.*, 164; and in the elaborate opinion of Judge Nisbet, in the case there reported, the entire subject is discussed, and it is settled so far as sound reason can settle any point of law, that such a contract as this made by this officer, the head of the city government with that government, to be performed by himself and overseen for the city by himself, cannot be upheld. Indeed, a sheriff cannot, if a party, even serve process—3344th section of the Code—29 *Ga.*, 197. So, too, an agent cannot buy, if employed to sell, or sell, if employed to buy—Code, §2186; nor can an agent make a profit out of the principal's property—Code, §2187. That public agents fall within these sections, appears clear from section 2212, which excepts that class of agents from personal liability when contracting for the public, but upon the principle, "*inclusio unius, exclusio alterius*, applies to them all other provisions applicable to all agents in common. So a trustee cannot use trust funds for his own profit—Code, §2332; and see 12 *Ga.*, 534, and 36 *Ga.*, 780, to these points. So the very first section of the first article of the constitution of 1877 declares that public officers are *trustees and servants* of the people—Harris' Supplement to the Code, 99. So that the current of Georgia policy, both in legislative and judicial channels, runs steadily in one direction and to one point, that no man who is agent or trustee for another, whether a private or public agent or trustee, shall have the opportunity or be led into the temptation to make profit out of the business of others entrusted to his care, by bargaining with himself, directly or indirectly, in respect to that business.

Such is the spirit and policy of the act of 1801, and the

subsequent legislation of the state, and of the decision in 9 *Ga.*, one of our early and ablest opinions by our first court, Judge Nisbet delivering it, and the subsequent decisions in the same line.

It would seem, therefore, to be unnecessary to fortify our own judicial exposition of our own statutes by the authority of courts foreign, or *quasi* foreign, to us upon cases and questions similar to those declared and ruled by our own courts.

If need be for other reference, however, we could refer on the same general line to 4 Howard, 553; 21 Wallace, 182, 616; Kerr on Fraud and Mistake, 160 ; Wood on Master and Servant, 213, 215; 1 White and Tudor, Lead. Cases in Equity, 72, 115. 2 Johnson's Chancery R., 252; 3 American Reports, 105; Zinn's Leading Cases on Trusts, 76, being a great case before the House of Lords, where the chancellor, Lord Cranworth, delivered his opinion for reversal, and ex-chancellor, Lord Brougham concurred, both opinions being in point on this question, it being held that a director of a railroad company could not contract with the company ; 25 Wisconsin, 551, where it was held that a school commissioner could not contract with the other commissioners to build the school-house. See also, Garrison *vs.* City of Chicago, Law and Equity Reports, pamph., August 1877, p. 166. 1 Perry on Trusts, 59, 194, 194, 206, 207, 209, 210. Smith *vs.* City of Albany, 61 N. Y., 444. Indeed the books abound in the general principle—sometimes and under some circumstances annulling absolutely the contract—at others and under other circumstances on terms ; but we rest the case confidently upon the great fundamental principle that the mayor is paid to superintend all this work done for the city—that he is her administrative and executive officer, to see that the work is well done—that it is wholly unreasonable, and against all public policy, therefore, that he be permitted to make a contract to do what his official duty makes him superintend and oversee, and holds him responsible for.

Code of Macon, section 83. In respect to contracts about the purchase of lots for homes or things of that sort, this case, it will be seen, is put on a different basis; and of course is wholly unlike the contract for the mayor's salary.

2. But it is urged that the contract has been ratified, and that even if originally illegal, it is now good. Ratified how? by whose authority? The mayor has been the head of the city government ever since the contract was made, and if it could not be made with him whilst he was the head of the government and part of the council, having the right to give the casting vote, it is difficult to see how and by what competent authority it has been ratified. If a clean mayor and council, of which Mr. Huff was not a member, should do any act or omit to do any act, by which, either by their conduct or acquiesence, this contract was ratified, we are of the opinion that it could be ratified; because as such council and mayor could originally make a legal contract with Mr. Huff, he not being the head thereof, there is no reason why it should not ratify an old one. It would be just the same in effect as if they had made a new one when they ratified the old.

But as the supposed ratification could have been made, and the acts which it is argued amount to it were done by the same council which originally did the illegal thing, and by another council down with the same complaint, Mr. Huff still being similarly related to both, no act or omission to act on their part can so operate as to make this contract legal by ratification. It is true that Mr. Huff has been elected mayor since the making of these contracts, and since they were probably generally known, but certainly unless the question was by competent authority, derived from an act of the legislature or the charter, submitted to vote, the only lawful mode in which the corporation can act, either to make or ratify a contract, is through the mayor and council, and it would be folly to hold that a contract, illegal because made by one who was mayor when it was made with the council of which he was head, could be ratified by a council of which he was still the

head.  We hold, therefore, that no act or conduct on the part of the city, through its authorized agents, has in law operated to ratify and legalize this originally illegal contract.

3. But, nevertheless, it is a universal principle of equity that whosoever enters her courts as a suitor must cleanse himself at the threshold, and that she will administer relief to no complainant who fails or refuses to do equity himself.

Before, therefore, this complainant can have any relief in equity, it must do equity itself.  Certainly it must do so where the chancellor is satisfied that there is no actual or intentional fraud on the part of the defendant, and that public policy alone demands that the law be enforced and the contract be rescinded or annulled.  This seems to have been the idea of Lord Brougham in the Aberdeen Railway Company *vs.* Blaikie Bros., Zinn's Lead. Cases on Trusts, 76—where the case of the York Building Company *vs.* MacKenzie is cited, and where even ornamental improvements were required to be paid for, though the sale was annulled. That case is a very strong authority to invalidate these contracts at bar as illegal; but it seems, also, from the opinion of Lord Brougham before the house of lords, where the case was determined, to be an authority for paying Mr. Huff back what he has expended, with interest thereon, in the absence of fraud on his part.  That case, too, disposes of all that has been urged about the custom of former members of council to buy and deal with the city of Macon, of whom a long list, running back many years, is given in the record; but no case, so far as we see, of the mayor taking a contract to do work *which his official duty required him to supervise.*

Certainly, however, it is right and equitable that Mr. Huff should be paid by the city that which he has spent, and of which the city will reap the benefit.  It would be grossly unjust to hold otherwise, and, when this case is tried, this equitable principle will be applied to it.  On this point, see 1 Lead. Cases in Eq., 217, *et seq.*;  1 Perry on Trusts, 195, *et seq.*;  29 Beavan, 353;  30 Beavan, 235.  We mean, of

course, where the expenditures were made for the advantage and improvement and ornamentation of the property of the city, and properly, not recklessly, made.

4. But the question so far as the case now before us is to be now decided is this: did the chancellor err in refusing to enjoin Huff, or in refusing to appoint a receiver. It was his duty, undoubtedly, to protect the city, if it were ultimately in danger of loss, by injunction; but the answer, and there is evidence to support it, sets up that Huff has expended large sums of money on the park, making substantial and valuable improvements thereto, and ornamenting the same—that these sums amount to many thousand dollars—that the park never has been kept better—scarcely as well as at this time—that it is open to all the citizens for the great purpose of recreation, for which it was designed— and we cannot see, if these things be so, and the chancellor had the right to pass upon and believe them, how the city has been hurt or is likely to be hurt. It certainly owes Huff money, which has been expended upon its property, and which must be paid before equity will annul the contract—so that if the bargain made with Huff was a bad one for the city, and it could have made money, or could now receive a net income from the park, it is in no danger of ultimate loss so far as we can see.

At all events, everybody has access to the park, and there is no use for a receiver in that view; its rents, even if it could make anything clear, can hardly overgo what, *ex æquo et bono*, it owes defendant for work and labor, of which it has and will have the benefit, and there is no necessity for a receiver for that purpose, of collecting them if any could be made; and for the same reason, there seems no necessity for a temporary injunction.

At all events, we are quite sure that the chancellor has not abused his discretion in declining to grant the interlocutory order for receiver and injunction, especially as the complainant has not offered to do full equity, and has actually repaid defendant nothing.

5. The chancellor required the city to give a bond of two thousand dollars, and Huff of four thousand, to secure a note which was brought somewhat curiously into the controversy; but as nobody seems badly hurt by these comparatively small bonds, and as the defendant offered, himself, to give that exacted of him, we uphold the judgment as a whole, and remit all parties to regular trial on the principles hereinbefore laid down.

Judgment affirmed.