## 38475. GEORGIA DEPARTMENT OF HUMAN RESOURCES v. SISTRUNK et al.

WELTNER, Justice.

This case began with the filing by the Sistrunks of a petition for a writ of habeas corpus directed to the Georgia Department of Human Resources. It comes to us, however, on a matter purely collateral to the relief sought.

The Sistrunks are represented by Bobby L. Hill, Jr., a member of the House of Representatives of the General Assembly of Georgia. The Department filed in the trial court a motion to disqualify Hill as attorney for the Sistrunks upon its assertion of conflict of interest. The trial court held hearing on the motion, and prepared, in his usual scholarly manner, a comprehensive order which denied the motion to disqualify Hill, the essence thereof being às follows: "As long as he earns that livelihood in a manner that does not conflict with his responsibilities as a member of the General Assembly, then he cannot be disqualified, under the Department's fiduciary theory, from practicing his profession for compensation before a unit of the Executive or Judicial branch of government."

The Department appealed, urging that Hill's representation, *ipso facto,* runs afoul of Art. I, Sec. II, Par. I, of the Constitution of Georgia of 1976 (Code Ann. § 2-201), which states in part: "Public officers are the trustees and servants of the people, and at all times, amenable to them." The Department further urges that his representation is violative of the Code of Professional Responsibility (Code Ann. Title 9, Appen.)

Hill asserts that the legal representation by legislators of private clients against the State is a practice sanctioned by two centuries' usage; that no other jurisdiction in the Republic has created by court rule any such disqualification; and that nothing suggested by the Department is contrary to the Code of Professional Responsibility.

As to Hill's last contention, we agree. There is no dual representation in these circumstances, for the plain reason that a member of the General Assembly represents not the government of our State, nor any of its branches, departments, or agencies, but the electorate which is his constituency. With regard to his first two contentions, we disagree. The fact that a practice has endured for

centuries by no means establishes its propriety, as all of history abounds in ancient evils. Nor is the want of authorities within our sister states persuasive, as we see it our responsibility to apply the Constitution of Georgia to the facts before us, whether or not that be consistent with the holdings of other states.

The issue in this case is, then, the meaning of the constitutional provision declaring that "[p]ublic officers are the trustees and servants of the people, and at all times amenable to them."[1]

This language has been brought forward unchanged from its initial appearance in Art. I, Sec. I, Par. I of the Constitution of 1877, that paragraph reading as follows: "All government, of right, originates with the people, is founded upon their will only, and is instituted solely for the good of the whole. Public officers are the trustees and servants of the people, and at all times amenable to them." Earlier Constitutions embraced that same concept in differing words. The preamble of the very first Charter, the Constitution of 1777, contains this language: "We, therefore, the representatives of the people, from whom all power originates, and for whose benefit all government is intended, by virtue of the power delegated to us, do ordain and declare,...." The Constitution of 1861, at Art. I, Par. 16, holds: "A faithful execution of the laws is essential to good order; and good order in society is essential to liberty."

The object of our government and the function of public officers are set out with consistency from the earliest days of our history. It is important, therefore, in delineating the import of the word "trustees," to examine the manner in which that term was used contemporaneously with its first appearance in the Constitution of 1877.

The Code of Georgia of 1863, § 2309, read as follows: "The

---

[1] For later provisions which impose certain restrictions upon specified public officers, see Code Ann. § 26-2305 (providing, in part, that it shall be a felony for any officer or employee of the State to ask or receive anything of value to which he is not entitled in return for an agreement to influence or attempt to influence official action by any other officer or employee of the State) and § 26-2306 (providing, in part, that it shall be a felony for any officer or employee of the State who, for himself or on behalf of any business entity, sells any personal property to the State). See, in general, Code Ann. Ch. 26-23. Concerning limitations upon full-time appointive State officials and employees, see the Trading with the State Act, Ga. L. 1956, pp. 60, et seq., as amended (Code Ann. §§ 89-913 through 89-918). See also Art. III, Sec. V, Par. IV, 1976 Ga. Const. (Code Ann. § 2-1104), prescribing the oath required to be taken by each member of the General Assembly which includes the affirmation "...I will so conduct myself as will, in my judgment, be most conducive to the interests and prosperity of this State." Concerning limitations upon judges, see Georgia Code of Judicial Conduct, 231 Ga. A-1 (1974).

trustee must not use the trust funds to his own profit. He is liable to account for all such profits made." That section differs but slightly from our present law, Code Ann. § 108-429, as follows: "The trustee shall not use the trust funds to his own profit. He shall be liable to account for all such profits made."

The case of *Caruthers v. Corbin,* 38 Ga. 75 (1868), dealt with the responsibility of a fiduciary who, under the disjointed economy of the times, settled an obligation of an estate with Confederate Treasury Notes, profiting by supplying his own Confederate currency, which was worth but five cents on the dollar. Our court condemned that transaction, and laid down this plain and simple proscription — "He can not use his trust to promote his own personal interest." Id. at p. 91. In *City of Macon v. Huff,* 60 Ga. 221 (1878), this Court dealt with a mayor who had contracted with his city to do certain things. Condemning alike that transaction, we held: "Therefore, in the mayor's court of the city of Macon, Mr. Huff could not sit in a cause between himself and the humblest citizen of the city, involving the slightest breach of propriety or the smallest amount of money. Yet the effect of these contracts is to make him every day the judge in his own case. He has contracted for money to do certain work for the city, and as mayor of the city and its chief executive officer, it is his official duty to see that this work is well done. . . . His administrative and executive duties as mayor require him to overlook and judge of the extent and manner in which, as contractor, he discharges these obligations. Can he do it disinterestedly? Possibly he may; but the law regarding our fallen nature as all weak, and profiting by the prayer which the Son of God prescribed for all men, forbids that such temptation be laid in the path of any man, however exalted his office or pure his character. . . . It matters not how fair the contract may be; public policy will not uphold it. This principle is iterated and reiterated everywhere in the books. . . . So the very first section of the first article of the constitution of 1877 declares that public officers are *trustees and servants* of the people [omitting citation]. So that the current of Georgia policy, both in legislative and judicial channels, runs steadily in one direction and to one point, that no man who is agent or trustee for another, whether a private or public agent or trustee, shall have the opportunity or be led into the temptation to make profit out of the business of others entrusted to his care, by bargaining with himself, directly or indirectly, in respect to that business." Id. at pp. 225, 226, 228.

Perhaps the earliest treatment of this subject is *Harrison v. McHenry,* 9 Ga. 164 (1850), relating to the propriety of a sheriff purchasing on his own account property sold at public outcry. Justice Nisbet wrote: "The whole subject is discussed by Chancellor Kent, in

Davore vs. Fanning et al., in an opinion which is unsurpassed for its learning and ability, and in which it is settled that it makes no difference, in the application of the rule, that the sale was at public auction and *bona fide,* and for a fair price. . . . The Sheriff is a trustee for the defendant in execution, by virtue of his office. . . . All of which [powers] he holds in character of trustee for the owner; and being trustee, the obligations and disabilities of a trustee devolve upon him. . . . If, then, the Sheriff, who is the agent of the defendant, were permitted to purchase at his own sale, his duty to his principal and his own interest would stand in direct opposition. Either he must violate the duty which he owes to his principal, or exercise a virtue rare amongst men — that is, sacrifice his own interest to that of another. To avoid this collision of interest, and to prevent a temptation to infidelity in his trust, the law imposes upon him a positive prohibition. It is well settled, that an agent employed to sell, cannot himself become the purchaser; and an agent employed to buy, cannot himself become the seller. . . . The State has a right to require skill, diligence and fidelity in her agents. The paramount good of the whole people requires that she should exact all these things. . . . It is her duty so to regulate the execution of the laws, as to prevent injustice to the citizen, and to remove temptations from those who are chosen to execute them. The Sheriff *accepts* office — it is not forced upon him. He cannot, therefore, complain of the disabilities which are incident to it." Id. at pp. 166, 167.

A member of the General Assembly is, of course, a "public officer" within the meaning of the Constitution. "Certainly, where an individual has been appointed or elected, in a manner prescribed by law, has a designation or title given him by law, and exercises functions concerning the public, assigned to him by law, he must be regarded as a public officer." *Bradford v. Justices of Inferior Court,* 33 Ga. 332 (2) (1862). See also *Polk v. James,* 68 Ga. 128, 131 (1881): "An office is a public station or employment conferred by the appointment of the government. And any man is a public officer who is appointed by government, and has any duty to perform concerning the public; nor is he any the less a public officer because his authority or duty is confined to narrow limits."

We have set out these venerable authorities as illuminative of the state of our law at the time of the initial adoption of the constitutional provision here in question. We must now resolve whether or not the characterization of public officers as "the trustees and servants of the people, and at all times amenable to them" is a substantive declaration of duty or, to the contrary, nothing more than the rhetoric of a bygone day.

That provision has remained unchanged for over a century, and

we shall take it at its word. When our Constitution declares that "[p]ublic officers are the trustees and servants of the people," we interpret that declaration to mean that public officers are the trustees and servants of the people.

*All* public officers, within whatever branch and at whatever level of our government, and whatever be their private vocations, are trustees of the people, and do accordingly labor under every disability and prohibition imposed by law upon trustees relative to the making of personal financial gain from the discharge of their trusts.

May one trustee of the people, as attorney and for his own financial gain, initiate or defend a lawsuit on behalf of another which seeks to defeat the official public actions of another trustee of the people?

May one trustee of the people, as attorney and for his own financial gain, negotiate on behalf of another for a favorable official dispensation at the hands of another trustee of the people?

Specifically concerning legislators, may one trustee of the people — in whose office are vested the powers of enhancement, diminution, and destruction of the office of another trustee of the people — as attorney and for his own financial gain act in a manner to hinder or frustrate the discharge by such other trustee of the duties of their common trust?

No.

We repeat today what we said 132 years ago in *Harrison,* supra: "Either he must violate the duty which he owes to his principal, or exercise a virtue rare amongst men — that is, sacrifice his own interest to that of another. To avoid this collision of interest, and to prevent a temptation to infidelity in his trust, the law imposes upon him a positive prohibition."

We repeat today what we said 114 years ago in *Caruthers,* supra, at p. 91: "He can not use his trust to promote his own personal interest."

We repeat today what we said 112 years ago in *City of Macon,* supra, at p. 226: "It matters not how fair the contract may be; public policy will not uphold it. This principle is iterated and reiterated everywhere in the books."

Applied to the case before us, the Constitution prohibits a legislator from representing a client, for his own financial gain, in any civil transaction or matter wherein the State of Georgia shall be an opposing party.

Nor are the proscriptions of the law confined to legislators who are lawyers. They extend to every public officer.

It will be seen from the age of our authorities that we unveil no new precept here. To the contrary. What we have done is but to

remove from our Constitution the blemished wrappings of ancient usage.

*Judgment reversed. All the Justices concur, except Jordan, C. J., Clarke and Smith, JJ., who dissent.*

DECIDED MAY 19, 1982 —
REHEARING DENIED JUNE 22, 1982.

*Michael J. Bowers, Attorney General, Vivian Davidson Egan, Assistant Attorney General,* for appellant.

*Hill, Jones & Associates, Bobby L. Hill, Sutherland, Asbill & Brennan, Michael J. Egan, Jr., Timothy W. Floyd,* for appellees.

JORDAN, Chief Justice, dissenting.

One of the reasons for my dissent is to point out the fact that the majority opinion is limited to lawyer-legislator participation in civil transactions only. The question posed to the trial court dealt only with the possible conflict of interest of a lawyer-legislator in representing a client before a State agency in a civil action.

The Attorney General states the issue in his brief as follows: "Whether a legislator/attorney who, by virtue of his public office, is a trustee and fiduciary of the people of Georgia, amenable to them at all times, may bring a *civil* action on behalf of private parties against a State agency. . . ."

In stating the position of the parties in the trial court, the judge's order recites, *"Aside from criminal cases,* it is the opinion of the Attorney General, . . . that disqualification would obtain in cases where the State is plaintiff, such as condemnation proceedings, as well as in cases, such as the instant case, where the State is a defendant."

Thus the ruling of the trial court and the holding in the majority opinion relates only to civil transactions wherein the State of Georgia is a party and makes no holding with reference to a lawyer-legislator representing a client in a criminal transaction.

Another reason for my dissent is that I would apply an ad hoc rule of disqualification in civil cases of this nature rather than a per se rule. Conflicts of interest are not subject to a blanket generalized appraisal. A conflict of interest may appear as a nebulous sort of thing without consequence or harm or it may appear so blatantly as to shock the conscience.

Applying a per se rule of conflict of interest in every case involving a lawyer-legislator overlooks the fact that a lawyer-leg-

islator wears two very distinctive hats. I agree that as a legislator he holds a public office which he holds in trust for the people. As such he is cast with all the duties and obligations of that sacred trust as a member of the legislative department. At the same time, and at all times, an attorney at law is an officer of the courts (*Kellar v. State,* 226 Ga. 432 (175 SE2d 654) (1970)), and therefore to that extent a member of the judicial branch of government. This relationship places upon the attorney a solemn and binding obligation. As an attorney admitted to practice in this State and as an officer of the court, he is bound by the Rules and Regulations of the State Bar of Georgia. These rules provide strict guidelines for his professional conduct. I find it highly conceivable that a lawyer-legislator in most cases can live up to his duties and obligations which he incurs in each capacity without a significant disqualifying conflict of interest. In those cases where he cannot, an apparent conflict of interest would easily appear and appropriate action taken under the general laws and directory rules governing the Bar.

The Attorney General contends that Hill violated the Code of Professional Responsibility which states that "A lawyer should avoid even the appearance of impropriety." This Court addressed this canon recently in *Blumenfeld v. Borenstein,* 247 Ga. 406, 407 (276 SE2d 607) (1981) in which we said "Although the issue has never been squarely addressed in Georgia, courts in other jurisdictions have rarely been willing to disqualify an attorney based on the appearance of impropriety alone where there is no danger that the actual trial of the case will be tainted." We went on to say "Basic fairness will not permit the disqualification of an attorney because of wrong-doing imputed to the attorney by reason of his *status* when as a matter of fact no wrongdoing exists . . . The mere fact that the public may perceive some conduct as improper is, without some actual impropriety, insufficient justification for interference with a client's right to counsel of choice. This becomes even more apparent when the perceived impropriety is not conduct at all but is, instead, *status.*" (Emphasis supplied.) In that case we refused to adopt a per se rule of disqualification on the sole ground that an attorney's spouse is a member of a firm representing an opposing party.

The trial judge noted that in this case there is no allegation of improper conduct or an imputation of professional wrongdoing. He therefore refused to adopt a per se rule of disqualification and looked solely to the facts of this particular case. His order stated that "nothing in this order should be construed to prevent the disqualification of a lawyer/legislator who uses his influence as a

legislator to gain an advantage in representing a client against an agency of the State or who uses his position to self deal."

I agree and conclude, as did the learned trial judge, that the question of disqualification of a lawyer/legislator for conflict of interest in civil actions against the state should stand or fall on the facts of each particular case. I would therefore affirm the judgment of the trial court.

CLARKE, Justice, dissenting.

I must respectfully dissent. The majority has applied the law of trusts to the broad Georgia constitutional policy statement which is in fact a simple restatement of the old proposition that a public office is a public trust. In my view such an application requires mental gymnastics and strained reasoning.

The word "trustee" is capable of more than one definition. The use of the word in a "technical or legal sense" and the use of the word in its broader and looser context has been distinguished by legal authorities. See 89 CJS Trusts, § 3. The constitutional provision refers to public officers as "trustees and servants." The majority would hold that this use of the word "trustee" was intended by the drafters of the constitution to have been in the technical and legal sense. I could not so find. I cannot believe the framers of the Constitution intended this provision to cause all office holders to be caught up in the myriad rules of trust law. I believe the majority's imposition of a technical prohibition creates dangers more serious than the perceived ills sought to be cured.

For more than two hundred years, the State of Georgia has benefited by the existence of a citizen legislature. Historically the source of governmental power has been the people. It was the people who allowed the state to act as a transformer through which power flowed to the national government. Even though the central government has not always remained close to its source of power, the people of this state have jealously guarded the right to maintain a government which is near to its source. One of the effective means of holding the government close to the people has been the insistence on a citizen legislature as distinguished from a professional legislature.

This country has experienced its brightest hours when citizens acting as part time servants have moved to protect our rights. The opinion of the majority infers that there is something inherently bad about part time public servants and inherently good about full time public servants. History does not bear out this proposition. As an example: Part time soldiers who were full time citizens fired the shots heard around the world at Lexington and raised the flag at Mt.

Suribachi. Part time public servants risked their lives by signing the Declaration of Independence. Full time professionals commanded the troops at My Lai and directed the burglary at the Watergate.

I fear that the far reaching holding of the majority renders virtually impossible the service of full time citizens as part time public servants. In making this statement we must not overlook the fact that the prohibition set down by the majority is not limited to lawyers nor is it limited to legislators. Its effect can be nothing less than the creation of a special breed of persons . . . a governmental elite, removed by law from the daily problems and experiences of the great mass of the people. Thus by technicality they are deprived of the experiences which best qualify them to serve. In providing for this breed, the state must then decide if it is willing to compensate them so that competent persons will enter into this undertaking. If it is not, the positions may well be filled by those who lack the qualifications or perhaps the integrity which the public deserves.

The majority found no violation of the Code of Professional Responsibility and looked only to the law of trusts to support its holding. I agree with the majority that since a legislator represents the people and not the government or its agencies there is no conflict of interest arising from dual representation. Unquestionably as a servant of the electorate a legislator may not charge a fee for fulfilling the duties of his office. However, I do not believe that a legislator who charges a fee for services or goods that are outside the scope of his official duties is breaching a trust or a duty to his principal. Since there is no dual representation in this case, I see no difference in being employed by a member of the electorate for representation against a state agency and being employed by a member of the electorate for representation against a nongovernmental entity. In either case a direct conflict of interest may arise which requires disqualification by the courts, but unless a conflict is present, the clients are entitled to the attorney of their choice.

The conclusion that conflicts of interest can be dealt with as they arise is supported by the cases relied upon in the majority opinion. In each case the financial position of the official involved was directly affected by the exercise of his official judgment. There is no such conflict of interest in the present case.

In this case we have the opportunity to apply a strained interpretation of the law of trusts to public officials or to apply reason. In my judgment, reason dictates that we continue with a legislature close to the people and that we punish wrongdoing when it occurs. Mechanisms for punishment of official wrongdoing and preventing conflicts of interest are available and should be utilized in

appropriate cases. In the absence of such a showing, I would not disqualify a lawyer legislator. And I therefore dissent.

SMITH, Justice, dissenting.

The sole issue presented to this court is whether an attorney who is also a member of the Georgia General Assembly *must* be disqualified from representing a client in a superior court when the opposing party is the State of Georgia. Although the majority concedes that nothing in the Code of Professional Responsibility would be violated by Hill's representation of the Sistrunks, it interprets Art. I, Sec. II, Par. I of our Constitution (Code Ann. § 2-201) to prohibit "a legislator from representing a client for his own financial gain, *in any civil transaction or matter* wherein the State of Georgia shall be an opposing party." (Emphasis supplied.) I cannot agree that any provision of our constitution was intended to achieve such a result.

When the colony of Georgia was chartered in 1732, there were no lawyers, as it was the plan of the trustees of the colony that Georgia should be " 'a happy, flourishing colony . . . free from that pest and scourge of mankind called lawyers.' " Coulter, *Georgia — A Short History,* UNC Press 1947, p. 74. The colony failed to thrive however, and the return of the charter to the King in 1752 brought in a new government. The same year, Georgia's first lawyers arrived. Id. at 83. Lawyers have been involved in Georgia government ever since, and in my opinion rightly so. "Lawyers often serve as legislators or as holders of other public offices. This is highly desirable, as lawyers are uniquely qualified to make significant contributions to the improvement of the legal system." EC 8-8, Code Ann. Title 9 Appendix.

"[S]tatistics indicate that most . . . legislators are lawyers, farmers, merchants, or insurance or real estate brokers. Of these, all *except lawyers* frequently have a direct personal interest in state legislation . . . [I]t would seem undesirable for the imposition of [restrictions on legislators' outside activities] to result in a further narrowing of the occupational classes from which legislators will be drawn . . . [T]here is hardly an item of concern to any state employee or officer which does not fall under the aegis of the legislature. Included are many subjects perennially under its scrutiny which affect every legislator no matter what his occupation, such as tax rates, auto license fees, and utility rates; other concerns such as 'blue sky' laws, teachers' qualifications, or barbers' licenses are likely to affect certain lawmakers in their chosen fields." Note, *Conflicts of Interest of State Legislators,* 76 Harv. L. Rev. 1209, 1210 (1963) (Emphasis supplied, footnotes omitted).

Outside activity in the pursuit of careers is an inevitable result of having, as most states do, a part-time legislature.[1] Additional regulation of potential conflicts of interest of state legislators might be desirable, but such regulation, if hastily imposed and not closely tailored to the circumstances of those whose behavior is to be governed, could easily result in far fewer attorneys being able or willing to serve in our General Assembly.

The broad rule we establish today is, I submit, not only *not* closely tailored to the circumstances of legislators who also happen to be attorneys — more importantly, we are not merely establishing a rule which may be modified or abolished if experience shows it to be unwise: The rule we establish today is imposed as a matter of Georgia *constitutional law.* Thus, not only are we taking a step the legislature has chosen not to take,[2] we are foreclosing any future legislative action on the subject short of a constitutional amendment.

We presently have a directory rule regarding behavior of lawyers who are public officials. "A lawyer who holds public office shall not: (1) use his public position to obtain, or attempt to obtain, a special advantage in legislative matters for himself or for a client under circumstances where he knows or it is obvious that such action is not in the public interest; (2) use his public position to influence, or attempt to influence, a tribunal to act in favor of himself or of a client; (3) accept anything of value from any person when the lawyer knows or it is obvious that the offer is for the purpose of influencing his action as a public official." DR 8-101, Code Ann. Title 9 Appendix. Directory rules have the effect of law. *Cambron v. Canal Ins. Co.,* 246 Ga. 147, 151 (269 SE2d 426) (1980). The Attorney General does not allege any violation of DR 8-101. Rather, the Attorney General's position is that it is improper *per se* for a member of the General Assembly to represent a private party in litigation against the State or a State agency, because Art. I, Sec. II, Par. I of the Georgia Constitution (Code Ann. § 2-201) states: "All government, of right, originates with the people, is founded upon their will only, and is instituted solely for the good of the whole. Public officers are trustees and servants of the people, and at all times, amenable to them." The

---

[1] Legislators in Georgia receive a salary of $7,200 per year plus $44 a day for expenses while the General Assembly is in session and a mileage allowance for not more than one round trip per calendar week. Code Ann. § 47-107.

[2] Certain statutes have been enacted regulating the conduct of members of the General Assembly. See, e.g., Code Ann., Ch. 26-23 (Abuse of Governmental Office). The Attorney General does not contend that any of the Code sections in this chapter have been or will be violated by Hill's representation of the Sistrunks.

Attorney General's argument, accepted by the majority, is that by representing the Sistrunks in this action against the Department of Human Resources, Hill violates a fiduciary duty owed to the people of Georgia.[3]

My response is that in Georgia, "the *supreme power* resides in the *people*," not in any institution of government. *Beall v. Beall,* 8 Ga. 210, 215 (1850). Representative Hill owes no more of a fiduciary duty to the Department of Human Resources or any of its bureaucrats than the members of this Court owe to the Attorney General or any of his assistants, and Hill is no more required to agree with a position taken by the Department of Human Resources than we are required to agree with the Attorney General.

Previous cases of this court establish that a public officer may not "use his trust to promote his own personal interest." *Caruthers v. Corbin,* 38 Ga. 75 (1868); *DeKalb County v. Wilson,* 217 Ga. 566 (124 SE2d 273) (1962); *Malcom v. Webb,* 211 Ga. 449 (86 SE2d 489) (1955); *City of Macon v. Huff,* 60 Ga. 221 (1878); *Harrison v. McHenry,* 9 Ga. 164 (1850). I cannot understand how, in the absence of any allegation of a violation of DR 8-101, supra, it can be said that Hill is *using his trust* to promote his own personal interest simply by representing the Sistrunks against the Department of Human Resources, any more than he would be *using his trust* to promote his own personal interest by representing any client against any adverse party.[4]

The Attorney General cites no authority from any jurisdiction for the proposition that representation by a legislator of a private party in litigation against the State violates the legislator's fiduciary duty to the public.[5] Even the federal government, which has enacted comprehensive conflict of interest legislation, allows congressmen to handle, for a fee, court cases in which the federal government is a party or has a direct and substantial interest.[6] 18 USCA § 203. This right of congressmen is not shared by other federal public officials. Compare, 18 USCA § 205. The resulting discrimination in favor of

---

[3] The majority properly rejects the argument that Hill's representation of the Sistrunks would violate Canon 9 of the Code of Professional Responsibility: "A Lawyer Should Avoid Even the Appearance of Professional Impropriety." Rule 3-109, Code Ann. Title 9 Appendix. See *Blumenfeld v. Borenstein,* 247 Ga. 406 (276 SE2d 607) (1981).

[4] The cited cases establish the proposition that a public official may not in his public capacity deal with himself in his private capacity. There are no allegations of self-dealing in this case.

[5] Hill claims that only in Oregon are lawyer-legislators prohibited from representing an individual in a lawsuit against the state and there the prohibition is expressly incorporated into the state constitution. Oregon Const. Art. XV, Sec. 7.

[6] Congressmen may not practice, for a fee, before federal departments or agencies; the restrictions of 18 USCA § 203 do not apply when the tribunal is a court of law.

congressmen has been characterized as "justifiable." Perkins, *The New Federal Conflict-of-Interest Law,* 76 Harv. L. Rev. 1113, 1144 (1963). In my opinion, if congressmen can handle, for a fee, court cases in which the federal government is a party, our Georgia *part-time* legislators ought to be able to handle, for a fee, court cases in which our State government is a party.

All of us have a variety of interests and are influenced in innumerable ways. This is inevitable. Our only alternative would be to live in a vacuum. I cannot say that Bobby Hill's status as a legislator will have absolutely no influence on the trial court, any more than I can say that big advertisers have absolutely no influence on the editorial policies of the news media. I do say that the trial judge is just as capable of rendering a fair decision in this case as we are. Anyone claiming the contrary "must overcome a presumption of honesty and integrity in those serving as adjudicators." *DOT v. Del-Cook Timber Co.,* 248 Ga. 734, 741 (285 SE2d 913) (1982) (citing Withrow v. Larkin, 421 U. S. 35 (95 SC 1456, 43 LE2d 712) (1975)).

The constitutional provision relied on by the majority has been carried down unchanged from its first appearance in the Constitution of 1877. For over 100 years since its first adoption, lawyer-legislators have represented private clients against the State. This practice has not been challenged until now. "While neither length of time nor legislative action, though oft repeated, will sanction a violation of the organic law, . . . contemporaneous construction of a constitutional provision by the legislature, continued and followed, is a safe guide as to its proper interpretation, and should not be departed from unless manifestly erroneous." 16 AmJur2d, Constitutional Law § 125, pp. 485-6 (footnotes omitted). "Similarly, the fact that for many years a certain construction has been assumed to apply to a constitutional provision is of important force in determining its meaning." Id., § 124, p. 482 (footnotes omitted). It cannot be said that no doubt exists as to the meaning of Art. I, Sec. II, Par. I of the 1976 Constitution. It certainly cannot be said that the Constitution compels the result reached by the majority. I would not overturn a practice sanctioned by more than two centuries of usage.

I have found from my service in all three branches of state government that, with rare exceptions, men and women in public service are conscientious, honest and fair. The rule adopted by the majority will be but another obstacle placed in the path of potential public servants. Absent undeniable legislative misconduct and except where clear constitutional or statutory guidelines have been

established, I do not think this court has any business trying to police the outside activities of members of a separate and co-equal branch of our state government. I therefore dissent.