40894. GEORGIA DEPARTMENT OF MEDICAL ASSISTANCE
et al. v. ALLGOOD et al.
41021. GEORGIA DEPARTMENT OF MEDICAL ASSISTANCE
et al. v. PARHAM et al.
41117. GEORGIA DEPARTMENT OF MEDICAL ASSISTANCE
et al. v. ATHON et al.
(320 SE2d 155)

HILL, Chief Justice.

In these three cases, the question is whether nursing homes or pharmacies owned by members of the General Assembly or their spouses may, consistent with the Code of Ethics for Government Service and the State Constitution, receive Medicaid reimbursements from the state. The three trial courts which ruled on these cases held that they could. We granted the Georgia Department of Medical Assistance's application to appeal.

Mrs. Theresa Allgood, wife of Senator Thomas F. Allgood, owns 4 nursing homes, and, with Mrs. Glenn E. Bryant, wife of Senator Bryant, shares ownership of another nursing home. During fiscal year 1983, these nursing homes received $2.5 million in Medicaid reimbursements from the state covering 78% of their patients. Representative Bobby Parham owns a 50% interest in the Medical Arts Phar-

macy in Baldwin County, which received $129,000 in Medicaid reimbursements from the state in fiscal 1983. Representative Troy A. Athon owns 4 nursing homes and has a 60% interest in another, which together received over $3 million in Medicaid reimbursements during fiscal 1983.

The Georgia Department of Medical Assistance (DMA) administers the Georgia Medical Assistance Program pursuant to the provisions of Title XIX of the Social Security Act, 42 USCA § 1396 et seq. Under the federal act and regulations, in order to participate in the Medicaid program a state must formulate a plan meeting the requirements of Title XIX. Once the plan is accepted by the Secretary of Health and Human Services, the state administers it, determining patient eligibility, the criteria which private medical providers must meet to participate, and the reimbursement the state will pay providers for services to eligible recipients.

Medicaid recipients are certified through local welfare offices, but are given monthly eligibility cards through DMA. Once found eligible, a recipient has the right to choose the provider. Private businesses which want to become Medicaid providers must enroll with the DMA by signing a standard form "Statement of Participation" ("provider agreement"). In so doing, the provider agrees inter alia to seek reimbursement in writing only for covered necessary services which have in fact been provided, and to accept payment from the DMA as payment in full with nothing more from the recipient (except certain co-payments on drugs provided for under DMA regulations).

Pharmacies, whether in nursing homes or not, may fill or refill up to 6 prescriptions for approved drugs per month for eligible recipients. For these they are reimbursed according to established maximum allowable costs plus a dispensing fee determined according to federal regulations, or the customary charge, whichever is lower, and cannot charge the recipient for anything but a DMA authorized co-payment.

Nursing homes are certified for skilled or intermediate care, or intermediate care for the mentally retarded, depending on the amount and type of care available. Although eligible recipients have the right to choose their nursing homes, they must require the care provided by that facility, unless they are over 65 years old. Each Medicaid resident retains a $25 personal needs allowance per month and must pay all other income to the nursing home. Nursing homes are reimbursed for prescription drugs as a pharmacy, for covered services[1] by the number of days of care, and for other services if required

---

[1] Covered services are room and board, including prescribed special dietary requirements, laundry, nursing services, except private duty care, but including therapy, social services, personal care and grooming, special equipment needs, nonprescription drugs, and med-

by a physician. The "actual reimbursement rate" for covered services is calculated by subtracting the "patient income" from the "total allowed per diem billing rate." The latter takes into account actual costs for each facility on the basis of its yearly reported expenses in 5 areas: routine and special services; dietary; laundry, housekeeping, operation and maintenance of plant; administrative and general; and property. These costs are compared to a standard calculated by comparison of similarly situated facilities and an efficiency factor to establish a maximum rate. In addition, this "total allowed per diem billing rate" is also limited by the facility's customary charges to the general public. As a provider, the nursing home agrees to accept the authorized rate as payment in full for all covered services and not to require the recipient or recipient's family to make any additional payment for such services.

During its 1983 session, the General Assembly revised the Code of Ethics for Government Service. OCGA Ch. 45-10. Thereafter, the Attorney General was asked by a legislator whether their (or their spouses') receipt of Medicaid reimbursements from DMA violated the Code of Ethics. In July 1983, the Attorney General answered affirmatively. 1983 Ops. Atty. Gen. U-83-48, p. 227. Accordingly, DMA sent letters to all Medicaid providers seeking assurances that no public official owned more than the 25% interest which would bring the Ethics Code into effect. All three providers involved here administratively appealed the applicability of the Code of Ethics to Medicaid providers, but DMA affirmed its earlier decision. Appeals were filed by the providers under the provisions of the APA (OCGA § 49-4-153 (c)) in their respective superior courts, all three of which ruled in favor of the providers and against DMA, which appealed to this court.

The providers contend that they are not "transacting business" under OCGA § 45-10-20 (12), and thus not subject to the Code of Ethics provisions, but even if they are "transacting business," such transactions were exempt under OCGA § 45-10-25 (3) when the Code of Ethics was adopted in 1983 and are now specifically exempt under subsections (4) and (5) of OCGA § 45-10-25 which were added to the Code of Ethics by amendment in 1984. Ga. L. 1984, p. 1204. DMA argues that the receipt of Medicaid reimbursements by legislators and their spouses does constitute "transacting business," that such transactions are not exempt, and that if applicable, the exemptions are unconstitutional under 1983 Ga. Const., Art. I, Sec. II, Par. I, and *Ga. Dept. of Human Resources v. Sistrunk*, 249 Ga. 543 (291 SE2d 524) (1982).

1. OCGA § 45-10-24 (a) (1) provides as follows: "Except as pro-

---

ical lab and X-ray services if available.

vided in subsection (b) of this Code section, it shall be unlawful for any part-time public official who has state-wide powers, for himself or on behalf of any business, or for any business in which such public official or member of his family has a substantial interest to transact any business with any agency." The exceptions in subsection (b) are inapplicable here.[2] (Other exceptions appear in OCGA § 45-10-25 and will be considered below.) The phrase "part-time public official who has state-wide powers" is defined to include members of the General Assembly. OCGA § 45-10-20 (7), (9), (10). "Family" is defined and means spouses and dependents. OCGA § 45-10-20 (4). "Substantial interest" is defined as "the direct or indirect ownership of more than 25 percent of the assets or stock of any business." OCGA § 45-10-20 (11). "Transact any business" means "to buy, sell, or lease any personal property, real property, or services on behalf of oneself or on behalf of any third party as an agent, broker, dealer, or representative." OCGA § 45-10-20 (12).[3] "Agency" is defined to include departments of the state and thus includes the Department of Medical Assistance.

Applying OCGA § 45-10-24 (a) (1), supra, as defined by OCGA § 45-10-20, supra, to the facts of these cases, it provides that it shall be unlawful for any business in which a member of the General Assembly or his spouse owns more than 25% of the stock, on its behalf or as agent or representative of a third party, to sell or lease any personal or real property or services to DMA. The nursing homes here involved do not sell or lease property or services to DMA. They make space available and provide services to their patients.[4] DMA receives no property or service. Thus, the nursing homes are not "transacting any business" with DMA within the meaning of OCGA § 45-10-24 (a) (1) as the phrase "transacting any business" is defined by OCGA § 45-10-20 (12).

Similarly, a pharmacy selling medicine to a Medicaid recipient is

---

[2] Exceptions are provided in OCGA § 45-10-24 (b) for transactions made by sealed competitive bids, single transactions involving less than $250 and aggregating less than $9,000 a year, and transactions involving leases of real property which have been approved by the State Properties Commission or the Space Management Division of the Department of Administrative Services.

[3] The phrase "transact any business" hence is not to be understood to include every "business contract." See Briarcliff Haven v. Dept. of Human Resources, 403 FSupp. 1355, 1358 (N.D. Ga. 1975). Thus, the fact that the providers and DMA enter into a "provider agreement" is not conclusive.

[4] The provider agreement states: "The Georgia State Plan for Medical Assistance makes available reimbursement for certain covered *services rendered* by a qualified participant *to an eligible recipient*. . . ." (Emphasis supplied.) OCGA § 49-4-141 (5) provides: " 'Medical assistance' means payment to a provider of a part or all of the cost of certain items of medical or remedial care or *service rendered* by the provider *to a recipient* of medical assistance. . . ." (Emphasis supplied.)

not selling personal property to DMA and hence is not "transacting any business" with DMA as that phrase is defined in the act. In 1971, the Attorney General was asked for an official opinion as to whether the retail sale of drugs by a pharmaceutical provider dispensing drugs to Medicaid recipients was taxable under the sales and use tax act. The Attorney General noted that such sales "have not been previously taxed because the dispensing of drugs under the program was considered a sale to the state." Op. Atty. Gen. 71-145, p. 188 at 189. The Attorney General ruled that "This treatment is erroneous" because "the state is clearly not a purchaser." The Attorney General found that the state is not the purchaser because "The State does not obtain title or possession of the drugs, it does not acquire any propriatary interest in the drugs or right to control their use. . . ." Id. at 189. We agree. "[T]he state is clearly not a purchaser" of Medicaid drugs, there is no sale of personal property to the state, and hence the pharmacy here involved is not transacting business with DMA as the phrase "transact any business" is defined in OCGA § 45-10-20 (12), supra.

These conclusions are confirmed by OCGA § 45-10-25 (a) (3) which provides that OCGA § 45-10-24, supra, shall not apply to "Any transaction between a public official or employee or any business in which such public official or employee or any member of his family has a substantial interest and any person, the cost of which transaction is paid directly or indirectly by state funds, if the property or services involved in the transaction are for the private use and benefit of the person to whom such property or services are sold or rendered and such person does not subsequently sell or lease such property or services to an agency."

Applying this exception to the facts of these cases, it exempts any transaction between (a) any business in which a member of the General Assembly or his spouse owns more than 25% of the stock, and (b) a Medicaid recipient, the cost of which transaction is paid by state funds, if the property or services involved are for the private use of the Medicaid recipient. Here the nursing homes and pharmacy provide services and medicines to Medicaid recipients for their private use, and the exemption is applicable.

We are not persuaded otherwise by DMA's argument that the provider agreement and reimbursements from DMA to the provider renders this exemption inapplicable. Without characterizing the relationship between DMA and the provider, there remains a clear relationship between the provider of drugs and nursing home services and the recipients of such drugs and services. This exemption focuses on the latter and clearly contemplates the former in the words "the cost of which transaction is paid directly or indirectly by state funds." To hold otherwise would emasculate the exemption, for whenever state

funds were used the exemption would be inapplicable, thus eliminating its applicability to any situation at all.

In view of the foregoing, we need not analyze subsections (4) and (5) of OCGA § 45-10-25 enacted in 1984 which specifically exempt Medicaid providers from the act. Ga. L. 1984, p. 1204.

2. DMA argues, nevertheless, that these exemptions are unconstitutional under 1983 Ga. Const., Art. I, Sec. II, Par. I, as interpreted in *Ga. Dept. of Human Resources v. Sistrunk*, supra, 249 Ga. 543. Having determined that the administrative order at issue here, which held that the Code of Ethics for Government Service did apply to providers who receive Medicaid reimbursements from DMA, was erroneous, we need not consider the constitutionality of the statutory exemptions which would otherwise be applicable to these providers.[5]

In view of the foregoing, we need not reach the argument advanced by Mrs. Allgood and Mrs. Bryant that our constitution requires that their property be considered as their separate property, 1983 Const., Art. I, Sec. I, Par. XXVII, and that to treat their property as belonging to their husbands denies them equal protection of the law. Nor need we reach the providers' argument that applicable federal law preempts state law in this area.

The judgments of the trial courts of. Richmond, Baldwin and Rockdale Counties are affirmed.

*Judgments affirmed. All the Justices concur, except Marshall, P. J., who concurs in the judgments only.*

DECIDED SEPTEMBER 25, 1984 —
REHEARING DENIED OCTOBER 11, 1984.

*Michael J. Bowers, Attorney General, Stephanie B. Manis, Senior Assistant Attorney General, Mark H. Cohen, Assistant Attorney General,* for appellants.

*Hull, Towill, Norman & Barrett, David E. Hudson, Charles M. Jones, Barksdale & Barksdale, A. R. Barksdale, Patricia G. Dunleavy,* for appellees (case no. 40894).

*Yawn & Herrington, T. Dorsey Yawn,* for appellees (case no.

---

[5] This case presents an unusual but not unique situation in that it is necessary to assume jurisdiction and issue a ruling in order to determine whether jurisdiction exists, and the ruling made would ordinarily result in a determination that jurisdiction does not lie in this court. See Bell v. Hood, 327 U. S. 678, 682 (66 SC 773, 90 LE 939) (1946); *Department of Transportation v. Claussen Paving Co.,* 246 Ga. 807 (1) (273 SE2d 161) (1980).